SHULTON, INC. *v.* RUBIN ET AL.

(Three Appeals in One Record)

[No. 439, September Term, 1964.]

*Decided August 4, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, SYBERT and BARNES, JJ.

*Francis D. Murnaghan, Jr.,* with whom was *James L. Wray* on the brief, for the appellant and cross-appellee.

*Marshall E. Miller,* with whom were *Raymond R. Dickey* and *Danzansky & Dickey* on the brief, for Martin Rubin and Chemed, Inc., two of the appellees and cross-appellants.

*Sylman I. Euzent* for the Georgia Capital Corporation, the other appellee and cross-appellant.

*Morris Turk* for the appellees and cross-appellants generally.

HAMMOND, J., delivered the opinion of the Court.

The controlling issue in this suit in equity for rescission of a contract by which Shulton, Inc., a relatively large and rich chemical corporation (the complainant below and appellant here), purchased the controlling capital stock of Chemed, Inc., a smaller chemical corporation (an appellee here), is whether the purchase was induced by material misrepresentations of fact made by Martin Rubin, another appellee, the founder, chairman of the board and principal stockholder of Chemed, and by other agents of that corporation.

Martin Rubin was awarded the degree of doctor of philosophy in organic chemistry by Columbia University in 1942, his doctoral thesis having been on the subject of steroidal heart drugs.

The year before he had held a fellowship at Johns Hopkins Medical School. After he graduated from Columbia he worked with, and as consultant to, several chemical firms, and after this he became an associate professor at both the Georgetown Medical School and its Graduate School. He has been granted some twenty-five patents in the field of chemistry and drugs and has had published over fifty scientific articles.

In 1953, Dr. Rubin, with a former schoolmate who was practicing law in White Plains, New York, formed Chemed, Inc. Chemed progressed slowly and in 1963 was leasing a small plant in Odenton, Maryland, from one William Starr who at one time had been its president and was its largest stockholder other than Dr. Rubin. It had four sources of income—fine chemicals, bulk finished products, research and development operations, and the production of hecogenin, an intermediate substance used in the making of steroid drugs, which Dr. Rubin had attempted to isolate from Mexican sisal plants over a number of years. Chemed needed capital and chemical manufacturing facilities and Dr. Rubin began seeking them out. Through an intermediary he was put in touch with Shulton, which was interested in entering the field of steroid chemical production.

After introductions had been arranged and preliminary discussions held, Dr. Rubin sent Shulton a written projection of Chemed's income and expenses for the fiscal year July 1, 1963-June 30, 1964, and for the fiscal years 1964-65, 1965-66, 1966-67; the estimated receipts from fine chemicals were respectively $36,000, $48,000, $60,000 and $85,000 from bulk finished products $15,000, $25,000, $40,000 and $60,000, from research and development $8,000, $10,000, $25,000 and $25,000, and from the hecogenin, which Dr. Rubin listed as "Bulk Manufactured Products," the estimated receipts were $45,000, $75,-000, $150,000 and $225,000. The total projected receipts for the first year were $104,000 with estimated expenses of $162,000 (loss of $58,000), for the succeeding years respectively $158,-000 and $219,000 (loss of $61,000), $275,000 and $231,000 (profit $44,000), and $395,000 and $257,000 (profit $138,000).

In explanation of the figures for the hecogenin, Dr. Rubin wrote Shulton, "Chemed presently has a contract to deliver $45,000.00 of hecogenin to Glaxo in England, during 1963/64.

\* \* \* Trial lots have been made, shipped, accepted (and paid for!) by the customer."

Shulton's interest in Chemed was several fold. It not only wished to enter the field of steroid chemicals but to obtain the results of the knowledge and research of a highly reputable chemist outstanding in the field of the production of pure hecogenin from Mexican sisal, a result which others had not been able to obtain satisfactorily because of the difficulty of eliminating from the finished product tigogenin, present with hecogenin in Mexican sisal. It also wished to obtain the continuing benefits of Dr. Rubin's advice and skills. The intermediary who had brought Chemed to the attention of Shulton was a Dr. Jelling, to whom Dr. Rubin wrote that Chemed was a:

"\* \* \* major owner of a Mexican subsidiary which produces and ships to us \* \* \* a raw material from the sisal plant from which Chemed has developed processes for manufacture of Hecogenin, one of the recognized steroid raw materials. We have just signed a one year contract to supply our product in reasonable quantity to Glaxo in England. Glaxo is the major user of this route to the steroid end products. This contract was obtained after a year of development work in which our product has been evaluated vigorously by the British and found to be, by their admission, superior to their own manufacture.
\* \* \*

"At the present moment, we have completed arrangements with the Mallinckrodt Chemical Works in St. Louis to carry out the most difficult (for us in our present location with present facilities) phase of the production of our product for Glaxo.
\* \* \*

"Chemed is now actively seeking funds to:
\* \* \*

"2. Construct a suitable production unit for the meeting of our present Glaxo order and provide a base for future massive expansion in raw material production."

Dr. Jelling wrote to the president of Shulton on March 27, 1963, repeating in essence what Dr. Rubin had written him.

Thereafter Dr. Rubin and Dr. Fishbein, president of Chemed, met on various occasions with executive officers of Shulton and represented to them that Chemed had developed and used a dependable, reproduceable series of steps which could be relied on to produce, from sediment fermented from the juice of Mexican sisal plants, pure hecogenin at the rate of five to six per cent of the quantity of sediment worked, and that the product could be sold to Glaxo and others in commercial quantities of, initially, at least one hundred kilograms a month, at approximately three cents a gram. They also represented that Chemed had produced from Mexican sisal commercially disposable kilograms of hecogenin which Glaxo previously had bought and paid for and which, under its testing, had been found to meet its exacting standards.

Glaxo, an English company, was a large and perhaps the leading user of hecogenin which it made by patented processes from African sisal (which, unlike Mexican sisal, was not plagued by the presence and tenacious perseverance in remaining present of tigogenin). Because of the political uncertainties in Africa, Glaxo wished to insure an alternate source of supply of hecogenin which met its standards and therefore was very much interested in exploring the potential capabilities of Chemed. Before Shulton entered the picture, both Dr. Rubin and Dr. Fishbein had made various representations to Glaxo that the hecogenin it had shipped and the hecogenin it was to ship to meet Glaxo's purchase orders, (and these representations continued thereafter) had been made by it from Mexican sisal and that it had the capacity to produce one hundred kilograms a month from such sisal.[1]

---

1. Shulton's bill of complaint did not allege specifically that these representations had been made to Glaxo by Chemed and Rubin and were false nor did it allege that the three cent a gram price they told Shulton that Glaxo would pay was but an initial production price and that Glaxo had stated explicitly it expected to pay but one cent a gram for permanent production. However, these matters were fully developed in the extensive discovery procedures that preceded the trial and Shulton made timely motions to amend

During the negotiations Shulton sent its men to Chemed's plant to inspect its facilities and its limited inventory and to check its financial structure, but Shulton was never told the details of Dr. Rubin's method of producing hecogenin from Mexican sisal because the method was not patented and was deemed a trade secret by Dr. Rubin.

Chemed had only one class of stock, the charter authorizing 20,000 shares of common stock of which 12,400 shares were outstanding, 7,240 shares being owned by Dr. Rubin. There were also outstanding 3,040 warrants and options to purchase Chemed common stock at $25.00 a share. It was proposed that the existing Chemed stock be converted to a new Class B common, having the right as a class to elect two directors, and that a new Class A common, having the right as a class to elect three directors, be created and bought by Shulton in an amount equal to the number of shares of Class B common to remain outstanding, so that the existing stockholders of Chemed would elect two of five directors and Shulton three. Shulton agreed to pay $150,000 for such a share interest and to lend up to $150,000 more as additional capital when and as needed. It was agreed that there should be 10,000 Class B and 10,000 Class A shares.

Dr. Rubin stated that certain existing stockholders of Chemed would have to be bought out, since they would not, he was sure, agree to the conversion of their controlling common stock to Class B stock with limited voting rights. He estimated the number of shares of such dissident stockholders as "about 2,000 shares" and the amount needed to buy them out as about $50,-000. He told Shulton that subscriptions to Chemed stock had been at around $25.00 a share and that this was its present going price. Dr. Rubin further told Shulton that because Chemed owed $60,000 to Georgia Capital Corporation, a small business investment company, and federal law and regulations, applicable in this situation, forbade direct redemption of shares of dissident

---

the bill to cover them. The chancellor refused to permit the amendment, and in this he erred, we think. See Md. Rule 320 and also Standard Homes v. Pasadena Co., 218 Md. 619, 625, and Brucker v. Benson, 209 Md. 247, 256.

shareholders, it would be necessary for Shulton to buy the necessary shares and turn them in as part of the price to be paid by it for its Class A common stock, thus reducing the $150,000 purchase price by the amount Shulton paid for the stock of dissident holders. Dr. Rubin proposed and Shulton agreed that he should negotiate for and buy the shares at not more than $25.00 a share and resell them to Shulton for exactly what he paid for them.

Shulton required and obtained an agreement by Dr. Rubin that the outstanding warrants and options would be exercisable only against the new Class B common and that he would place in escrow sufficient shares from his own holdings of such stock to meet any exercise of such warrants or options.

The understandings and agreements of the parties were finally settled and defined at a meeting on June 14 between Dr. Rubin and Shulton's president and its executive vice-president. Thereafter Shulton's general counsel, assisted by a lawyer in a leading New Jersey firm who was retained by Shulton on the one hand, and Dr. Rubin's long time friend and legal adviser, who had joined with him in forming Chemed on the other, were instructed to and did prepare the necessary written agreement and the complementary corporate and closing papers.

Three days after the June 14 meeting, which crystallized the agreements between Dr. Rubin, Chemed, and Shulton, Dr. Rubin wrote Georgia Capital Corporation telling it that Shulton would put up some $50,000 to acquire about 2,000 outstanding common shares in order to reduce the total outstanding (which were to be converted to Class B stock) to 10,000 shares and would invest in Chemed about $100,000 additional as the further purchase price of the total of 10,000 shares of new Class A stock it was to buy and also lend an additional $150,-000 in the next few years. He further advised Georgia that Shulton would control Chemed through its three directors, that all outstanding warrants would be met from the new Class B stock, and added:

> "The only drawbacks to our acceptance of this opportunity are those that involve myself. You have noted, I am sure, that the provision that warrants be

exercised from the pool of new non voting stock means in essence that I will have to carry this burden alone. This means, as the situation stands now, that I have to provide for the 2,640 warrants to Georgia Capital and the folks in New York City as well as the option provided to Dr. Fishbein of 100 shares [actually 400 shares] as well as any new warrants that may have to be given to Dr. M. Selling [sic] who acted as 'finder' in the Shulton negotiation. These warrants would come from my present holdings of about 7,000 shares and represent an onerous burden and a bitter pill for the acceptance of the Shulton proposal. I am loathe to do this and would make the following request:

"That in the event the proposal Re: Shulton, outlined above be accepted and the loan of Georgia Capital to Chemed, Inc. be repaid with the contract penalty that:

"Georgia Capital agree to then exercise at least 50% of the warrants which I would be required to provide by payment to me of 30,000 at the rate of $25/non voting share of Chemed stock.

"I am hopeful that the management of Georgia Capital will understand my position and willing to accept my request."

Georgia agreed to the Shulton deal and advised Dr. Rubin it would exercise 1,200 warrants—and only 1,200.

Dr. Rubin began buying Chemed shares on June 16. On that day he bought 3,000 shares from Mr. Starr, the former president and early stockholder of Chemed and its current landlord, for $20,000 or $6.67 a share—without revealing to Mr. Starr in any way that the Shulton deal was imminent—and 200 shares held by Mr. Starr for two of his employees for $2,000. Between June 16 and July 10 he bought 100 shares from his lawyer at $25.00 a share, 20 shares for $30.00 a share from another holder, and 1,240 shares for $28.00 a share from five other stockholders, a total of 4,360 shares at an aggregate price of $54,220.

A draft of the proposed contract was sent to Dr. Rubin and

his lawyer about June 28. On July 1, Dr. Rubin informed Shulton's executive vice-president that the number of shares acquired by him for resale to Shulton, so that Shulton could deliver the shares to Chemed as partial payment of its $150,000 equity investment in that company, totalled 2,400 and that they had been bought at an average price of $23.00 a share.

Because Dr. Rubin was scheduled to leave soon for Europe the execution of the contract and the settlement under it and the various corporate maneuvers in connection with it were all planned to take place as one integrated transaction on July 10. On July 5, a pre-closing four hour conference was held between counsel for Shulton and the lawyer representing Dr. Rubin and Chemed, at which the papers were gone over and revised and the preparation of those not yet written planned and assigned. On July 10, the parties and their lawyers met at Shulton's office. Dr. Rubin, Chemed and Shulton then executed a written agreement calling for:

1. The purchase by Dr. Rubin of 2,400 shares of outstanding Chemed common stock and the sale thereof to Shulton at closing at the prices paid by Dr. Rubin up to a maximum of $25.00 a share.

2. After retirement of the 2,400 shares, the conversion of existing Chemed common stock—10,000 shares—to Class B common stock, with the sole voting right to elect two of Chemed's five directors.

3. The subscription to and purchase at closing of 10,000 shares of Class A common stock of Chemed by Shulton at a price of $150,000, less the cost to Shulton of the 2,400 shares it bought from Dr. Rubin.

4. Loans from Shulton to Chemed from time to time as needed up to an aggregate of $150,000.

In the agreement Dr. Rubin represented and warranted that the shares he sold Shulton were free and clear of encumbrances and that there were outstanding no warrants, options or "other devices" which could require the issuance by Chemed of Class B common stock or other security:

"* * * except that there are warrants outstanding to purchase Chemed capital stock as follows: Georgia

Capital Corporation 2,400 shares; Lawrence Fishbein 400 shares; Samuel Beck 102 shares; Howard Weinberger 102 shares; Robert Markewich 36 shares; and as to these Rubin represents and warrants that the holders shall agree to have their warrants applicable against Class B Common Stock, restricted as other shares hereunder, and Rubin shall place shares of his own in escrow with Chemed for delivery against full or partial exercise of such warrants."

He also agreed that:

"No representation or warranty by Rubin in this Agreement nor any statement or certificate furnished or to be furnished to Shulton pursuant hereto, or in connection with the transaction contemplated hereby, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein not misleading."

In the agreement all obligations of Shulton were made subject to the fulfillment of the condition that:

"The representations and warranties of Rubin and Chemed contained in this Agreement or in any certificate or document delivered pursuant to the provisions hereof or in connection with the transactions contemplated hereby shall be true at and as of the time of Closing as though such representations and warranties were made at and as of such time."

Dr. Rubin agreed to indemnify and hold harmless Chemed and Shulton at all times after the date of the agreement against and in respect of:

"any and all damage or deficiency resulting from any misrepresentation, breach of warranty or non-fulfillment of any agreement on the part of Rubin under this Agreement or from any misrepresentation in or omission from any certificate or other instrument furnished to Shulton hereunder * * *."

It was further provided that:

> "All statements contained in any certificate or other instrument delivered by or on behalf of Rubin pursuant hereto or in connection with the transactions contemplated hereby shall be deemed representations and warranties by Rubin hereunder. All representations, warranties and agreements made by Rubin in this Agreement or pursuant hereto shall survive the closing hereunder and any investigation at any time made by or on behalf of Shulton."

At the closing meeting, Dr. Rubin signed and delivered to Shulton a statement, "* * * that the 2,400 shares of capital stock of Chemed, Inc. being sold by me this date to Shulton, Inc., were purchased by me at a net cost to me equal to the amount being paid to me by Shulton, Inc.,—$55,200." Shulton delivered to Dr. Rubin a check in the amount of $55,200, bearing the notation on its face, "Payment for 2,400 shares of Chemed, Inc. common stock @ $23 per share," which Dr. Rubin endorsed and deposited.

Dr. Rubin also executed a stock deposit agreement in which, "in order to induce Shulton, Inc. to enter into an agreement of even date herewith with the parties hereto," Rubin and Chemed stipulated that there were outstanding options to purchase Chemed common stock in the numbers listed, and further agreed, that Rubin simultaneously was to deposit with Chemed 1,840 shares of Chemed common stock registered in his name, endorsed in blank, and authorized Chemed to use said shares to fulfill his obligation to issue and deliver shares of capital stock in the event any or all of the foregoing options are exercised. Shulton agreed:

1. That Chemed would collect and remit to Rubin "the purchase price [$25.00 a share] received from the optionee(s)."

2. That Chemed would deliver to Rubin all shares allocable to any option which expired unexercised.

3. That Rubin could vote and would receive dividends on the shares while they were held in escrow.

Dr. Rubin delivered to Shulton at the settlement 12,400 shares

of Chemed stock, all endorsed or with executed stock powers attached. Shulton was to reissue the shares as called for in the agreement. Because new certificates had not been printed, only Georgia Capital Corporation was given a certificate—a blank form filled out—for its 1,200 shares of new Class B stock and Dr. Rubin was given the $30,000 Georgia paid for that stock. Shulton paid Georgia its loan to Chemed, with prepayment penalty and interest and gave Chemed a check for the balance of the $150,000 equity investment remaining after the payment of $55,200 and the $63,000 plus to Georgia.

Finally, there was executed an agreement under which Dr. Rubin was to serve as a consultant to Chemed for three years at an annual compensation of $18,000.

Soon after the closing settlement, Dr. Rubin departed for Europe and Shulton, several weeks later, came to the realization that it had been misled to its serious detriment by various untrue statements of material facts and various omissions to state material facts without which statements made were misleading. Shulton became convinced (a) that Chemed and Dr. Rubin could not produce hecogenin from Mexican sisal except in small laboratory quantities and that it had produced only a few grams over a period of years—having bought hecogenin made by others from African sisal to ship to Glaxo; and (b) that Dr. Rubin had not paid $55,200 for 2,400 shares of Chemed stock as he had certified, but instead had bought 4,360 shares for an aggregate price of $54,220, thus using Shulton's money to secure the shares he had to provide to cover the outstanding options, shares he would either continue to own if the options went unexercised or from which he would receive the proceeds if the options were exercised.

In September both Dr. Rubin and Dr. Fishbein returned from Europe and meetings were held with Shulton executives. Neither could offer explanations or evidence which shook Shulton's belief it had been defrauded and it promptly made demand on Chemed and Dr. Rubin to rescind, offering to return the 10,000 Class A shares acquired by it. When the demand was not met, suit for rescission was filed, claiming false representations of material facts as to the purchase of the stock and as to the development and use of a feasible process for extraction

of hecogenin from Mexican sisal in commercially saleable quality and volume. Right to relief was claimed against Chemed and Rubin severally and jointly under the case law of rescission and also under the Federal Securities Act of 1933, as amended, the Maryland Securities Act, and the New Jersey Uniform Securities Law. Chemed, in derivative pleadings by Dr. Rubin, answered and counterclaimed for injuries and damages alleged to have been caused by Shulton in destroying Chemed's business by mismanagement and inaction after July 10, 1963. The claim was for $1,000,000 in actual damages and $1,000,000 in punitive damages. Georgia Capital Corporation similarly answered and cross-claimed.

After extensive pretrial discovery procedures and a lengthy trial, Judge Duckett found that Dr. Rubin had agreed and certified at the closing on July 10 that the 2,400 shares sold by him to Shulton were purchased by him at a net cost of $55,200 or $23.00 a share while the fact was that he had actually purchased 4,360 shares for $54,220 or $12.43 a share. Judge Duckett said he did not find that Dr. Rubin "* * * made a material misrepresentation as to a feasible process for the extraction of hecogenin." He added: "It may be that Rubin had not developed a commercially feasible process but he had developed a laboratory process, and his real purpose for bringing in the vast resources of Shulton was to develop a large commercial production." He signed a decree on October 22, 1964, for a monetary judgment in favor of Shulton for $25,368 (the difference between $23.00 and $12.43 a share, or $10.57 times 2,400), with interest at 5% from July 10, 1963, and for a counsel fee of $2,500 to Shulton counsel. The costs were split between Shulton on the one hand, and Chemed and Rubin together on the other.

A supplemental decree dated November 2, 1964, dismissed the counterclaim of Dr. Rubin and the cross-complaint of Georgia Capital Corporation.

We think the chancellor erred in not granting Shulton the relief of rescission which it sought, finding the record to compel the conclusion that Chemed and Dr. Rubin made material misrepresentations of fact as to the purchase price of the stock bought by Dr. Rubin for resale to Shulton and other false rep-

resentations, which induced Shulton to consummate its purchase of Chemed's capital stock for $150,000.

The written agreement of July 10 and the complementary papers executed simultaneously are complete, clear and unambiguous and Chemed and Dr. Rubin must be held to be bound by the documents they signed. *Rappold v. Rappold,* 224 Md. 131, 136; *Ray v. Eurice,* 201 Md. 115, 125. The contract provided that it was to be "construed and enforced" in accordance with the law of New Jersey. The law of that State is in accord with the law of Maryland. *Ross v. Orr* (N. J.), 69 A. 2d 730; and *Casriel v. King* (N. J.), 65 A. 2d 514, 516-17. Without having sought to reform the written agreements and understandings of the parties, as would be necessary if, subject to exceptions not here pertinent, it was desired to show by parol testimony that they did not express the contract the parties intended to make, *Gabriel v. Glickman* (N. J. Misc.), 51 A. 2d 106, 108, *cf. Ray v. Eurice, supra,* Dr. Rubin sought to explain away by parol testimony, which came in over objection, his flat written certification that he had paid $55,200 for 2,400 shares of Chemed's stock. His explanation is, in essence, that Shulton should not have believed the certification because the actual agreement was not that expressed in the documents, but rather was that he was authorized by Shulton to buy as many shares of Chemed stock as any of the stockholders other than himself desired to sell, and that he had told Shulton that he would buy not less than 3,200 shares and probably about 4,200. He further claimed that it was understood that the first 2,400 shares purchased were to be turned in by Shulton for retirement and that the remainder would be delivered to Chemed to be held as treasury stock to cover the exercise of warrants and options so that Dr. Rubin would have to provide shares from his own holdings to cover warrants and options only to the extent that the available shares in Chemed's treasury were insufficient.

Both Dr. Rubin and his lawyer conceded from the stand that the papers as prepared and as reviewed and as signed by Chemed and Dr. Rubin were at complete variance with the understanding testified to and relied on at trial by Dr. Rubin, and also that they did not either before or at the closing meeting raise any question concerning the text of the papers. The lawyer had

684

two explanations. First, he said he had not been sufficiently alert and "astute" and, second, he thought, as Dr. Rubin testified he also thought, that Shulton caused the papers to be prepared as they were in order to evade taxes.

Assuming for the discussion that this testimony which sought to vary the integrated agreements, and the countervailing testimony adduced by Shulton in rebuttal, properly should have been considered by the chancellor, Dr. Rubin's explanation of why he signed the certificate and the escrow and stock deposit agreements is so inherently improbable and so unsupported, if not completely refuted, by other oral or written evidence, as to be incredible. No theory as to how Shulton was to benefit taxwise or otherwise by drawing the papers the way they were drawn, if the actual agreement was as Dr. Rubin contended at trial, was presented below or on appeal. All Shulton officials who testified, including its house counsel, flatly denied that the agreement was other than as expressed in the papers, and their testimony was supported by the lawyer in private practice retained by Shulton, and to a substantial degree by the vice-president of Georgia Capital Corporation. Dr. Rubin's letters to Georgia Capital, setting out his understanding of Shulton's proposals which coincided with the understandings expressed by the papers he later executed, refute his claims at the trial. After the closing, Shulton's counsel wrote Dr. Rubin and his lawyer, setting out the names of all new Class B stockholders and the number of shares to be issued to them respectively, and asking confirmation so as to insure accurate issuance of the stock. Dr. Rubin was listed as the owner of 7,810 shares, to be represented by seven stock certificates of which five certificates for various numbers of shares, 1,840 in total, were noted on the list as representing the shares which had been put in escrow by Dr. Rubin to cover outstanding warrants and options. Dr. Rubin's lawyer confirmed in writing the correctness of these listings, all of which were in accord with the closing papers, and Dr. Rubin did not answer the letter to him until after the demand for rescission.

No explanation has been given as to why Shulton would, if Dr. Rubin's version of the transaction is accurate, have permitted him to claim as his own the 1,840 shares of Chemed

stock put in escrow—since he personally would receive the subscription price on the exercise of the warrants or options, or the stock if there was no such exercise,—by listing him as the owner of the stock it had paid for and which was to be held as treasury stock by Chemed.

We have no doubt that the misrepresentation by Dr. Rubin as to the price he paid for the 2,400 shares of Chemed stock he bought and resold to Shulton was material and an inducing cause for Shulton to enter into the agreements it made with Chemed and Rubin. Shulton had consistently been informed that Chemed's stock sold at about $25.00 a share and that it would take about $50,000 to buy 2,000 shares. It authorized Dr. Rubin to pay up to $25.00 a share for the stock of dissident holders. It seems apparent that if Shulton had known that a former president and director of Chemed was willing to sell his shares for less than $7.00 a share it would not have agreed to make a $300,000 investment in Chemed, based on a general price level of $25.00 a share for its stock. Shulton's officers so testified. Every cent Shulton spent to buy the stock of dissident Chemed holders reduced the amount left of the $150,000 to go into Chemed's treasury, and increased the likelihood of calls on Shulton for additional capital contributions. Statements of fact as to cost have been held to be material representations. 3 Pomeroy, *Equity Jurisprudence*, Sec. 878c (5th Ed. 1941); *Fourth National Bank in Wichita v. Webb* (Kan.), 290 P. 1; *cf. Joice v. Taylor*, 6 G. & J. 54. Here we think they certainly were.

A substantial inducement for Shulton's purchase of Chemed's stock was the obtention of the skills and knowledge of a reputable chemist of Dr. Rubin's stature and standing as Shulton understood it. If Shulton had known that Dr. Rubin would falsely certify that he had paid out $55,200 to acquire 2,400 shares of Chemed stock for resale to it at cost when actually he had paid out $54,220 to acquire 4,360 shares—with the result that he obtained free the shares he needed to meet his obligation to provide stock to cover outstanding warrants and options (and also the extra $980 which he quietly pocketed), Shulton's confidence in Dr. Rubin and its desire to be asso-

ciated with him could not have failed to have been destroyed, as indeed it was, when the facts became known to it.

Finally, Shulton showed how material it deemed all representations made at or in connection with the closing and the execution of the agreements by requiring Chemed and Dr. Rubin to agree that there could be no "untrue statement of a material fact" and that "all statements contained in any certificate * * * shall be deemed representations and warranties * * *," and should survive both the closing and any necessary investigations by Shulton.

Under both Maryland and New Jersey law a false representation of a material fact devoid of intent to deceive will not support an action in deceit at law but a material misrepresentation of fact, though there be no actual moral delinquency, may warrant rescission by a court of equity of a contract induced thereby. *Joice v. Taylor, supra; Tucker v. Osbourn,* 101 Md. 613, 618; *Euzent v. Barrash,* 180 Md. 451, 454; *Hutson v. Hutson,* 168 Md. 182, 186; *Clark v. Kirsner,* 196 Md. 52, 56; *Finley v. Keene* (N. J. Ct. Ch.), 42 A. 2d 208; and *cf. Senick v. Lucas,* 234 Md. 373. See also 5 Williston, *Contracts,* Sec. 1500 (Rev. Ed. 1937) ; Restatement, *Contracts,* Sec. 470, 476; Restatement, *Restitution,* Sec. 9, Sec. 28; and 3 Pomeroy, *Equity Jurisprudence,* Sec. 885 (5th Ed. 1941).

The Maryland Securities Act, Code (1964 Supp.), Art. 32A, Sec. 34(a) (2), provides that any person who:

> "Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs,

and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. * * *."

Sec. 38 (a) of Art. 32A provides that Sec. 34, among other sections, applies when an offer to sell is made in this State, and Sec. 38 (c) says that an offer to sell is made in this State "* * * whether or not either party's then present in this State, when the offer (1) originates from this State * * *."

The negotiations leading to the sale of the Chemed stock to Shulton were initiated in Maryland and continued to emanate from this State. The Federal Securities Act, 15 U. S. C. Sec. 77L and the New Jersey Uniform Securities Law, N. J. Rev. Stat. Cum. Supp. 49:3-19, both of which may well be applicable here (although we do not need to decide whether they are or not), contain substantially the same provisions of Sec. 34 of Art. 32A of the Code of Maryland.

We think that under both the case law and the Maryland statute Shulton is entitled to rescission by reason of the false representations by Dr. Rubin, made binding on Chemed by the agreement of July 10, 1963, as to the price he paid for 2,400 shares of Chemed stock.

It is apparent also that Chemed and Dr. Rubin made many material misrepresentations of fact to Shulton, to induce it to buy Chemed's stock, as to the production of hecogenin by Chemed. There were representations that Chemed made from Mexican sisal all the kilograms of hecogenin it had shipped to Glaxo and that Glaxo had tested such hecogenin and found it superior to its own, when the fact was it had purchased all, or almost all that hecogenin from other manufacturers who made it from African sisal, and it was the purchased African hecogenin that Glaxo tested. There were representations that Chemed had made Mexican hecogenin in commercial quantity when the fact was it had not. There were representations that the raw material shipped from Mexico was dependable and uniformly would yield approximately five per cent by volume of pure hecogenin, when the fact was that the material varied greatly and yielded only from one-half of 1% to 2%. Shulton was told that the

hecogenin was extracted by an alcohol solvent when in fact the poor quality of the Mexican sisal sediment required an acetone solvent to produce proper purity in the resulting hecogenin. Shulton was also told that the price to be paid by Glaxo for alcohol hecogenin was about three cents a gram when Chemed and Rubin knew that Glaxo expected to drop to one cent after production in quantity began.

Shulton was led to believe by material misstatements of fact and omissions to reveal facts, which truth and fairness required to have been disclosed, that in Chemed it was buying a proven producer of commercially disposable and profitable hecogenin when the fact was that Chemed had over the years produced only relatively minute quantities of Mexican hecogenin by tedious and expensive laboratory processes.

The decree appealed from by Shulton will be reversed and the case remanded for the passage of a decree rescinding the transactions of July 10, 1963, between Shulton and Chemed and Rubin, and directing Chemed and Rubin jointly and severally to pay to Shulton $150,000 with interest at 6% from July 10, 1963, a counsel fee of $12,500 to counsel for Shulton, and costs, and directing Shulton to return to Chemed 10,000 shares of Class A stock of Chemed.

The supplemental decree dismissing the cross and counterclaims of Rubin and Georgia Capital Corporation will be affirmed. Shulton asked Chemed and Rubin to rescind within a few weeks of July 10, 1963, and if they had, as they should have, all the damages and injuries they now claim were inflicted by Shulton—most if not all of which flowed directly from the weaknesses which led Chemed and Rubin to the misrepresentations that produced the right in Shulton to rescind—could have been avoided, if they were avoidable at all.

*Decree of October 22, 1964, reversed, and case remanded for passage of a decree in accordance with the opinion herein; supplemental decree of November 2, 1964, affirmed, costs to be paid by appellees, and cross-appellants.*