583 F.2d 1259
 C. Thomas CLAGETT, Jr., trustee, and Ira S. Siegler,
trustee, and the Riggs National Bank of Washington, D. C. (a
National Banking Association organized and operating under
the National Banking Laws of the United States of America),
trustee, and John Lawson Senior, Jr., Appellants,
v.
Richard H. HUTCHISON, Jr., and Steven Sobechko, and James
Sobechko, and Joseph E. Shamy, and Mike Brown and
Daniel J. Rizk, Appellees.
 No. 77-1420.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 6, 1978.
Decided Sept. 14, 1978.
 
 Francis D. Murnaghan, Jr., Baltimore, Md. (Benjamin Rosenberg and John W. Scheflen, Baltimore, Md., on brief), for appellants.
 Lawrence S. Greenwald, Baltimore, Md. (Edward E. Obstler, Perry M. Gould, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., Charles H. Burton, Thomas E. Patton, Kurrus & Ash, Washington, D. C., on brief), for appellees.
 Before BRYAN, Senior Circuit Judge, and BUTZNER and HALL, Circuit Judges.
 K. K. HALL, Circuit Judge:
 
 
 1
 This appeal arises out of a civil action commenced by C. Thomas Clagett, Jr., and others who were minority shareholders of the Laurel Harness Racing Association, Inc. (Laurel). Jurisdiction was predicated upon diversity of citizenship. The plaintiffs sought recovery of monetary damages from Richard H. Hutchison, Jr. (Hutchison), once the majority controlling common stockholder of Laurel, and the subsequent purchasers of all or a portion of Hutchison's controlling common stock.
 
 
 2
 In relevant part, plaintiffs alleged that through certain stock transfers, the various defendants had breached two of the fiduciary duties they owed to the plaintiffs as minority shareholders.
 
 
 3
 First. Plaintiffs charged that, under Maryland law, defendant Hutchison, in the sale of his controlling common stock to defendants, Steven Sobechko, James Sobechko and Joseph Shamy, an attorney, had a duty to investigate the ability of that group to manage Laurel and to make inquiry into their characters and financial stability. (Count I). The same duty was alleged to exist between the Sobechkos and Shamy in the subsequent transfer of a portion of their stock to defendant Mike Brown. (Count II). And finally, the same duty was alleged to exist between the Sobechkos, Shamy and Brown in their transfer of the controlling common stock to defendant Daniel J. Rizk. (Count III).[1]
 
 
 4
 Second. Plaintiff charged that, under Maryland law, Hutchison, as the majority controlling common shareholder of Laurel, owed a fiduciary duty to the minority shareholders, including plaintiffs, to afford to them an equal opportunity to sell their shares on the same terms and conditions which were offered to him. (Count I). In Count II as against Hutchison's purchasers the same duty was alleged, and the Sobechkos and Shamy were charged with aiding and abetting Hutchison's violation of the "equal opportunity" rule.
 
 
 5
 All six defendants moved to dismiss, arguing that the Complaint failed to state a claim upon which relief could be granted under Maryland law. F.R.C.P. 12(b). The district court held, on the facts of this case, that neither of plaintiffs' theories of recovery stated a claim upon which relief could be granted, and the suit was dismissed. Plaintiffs appeal, and we affirm.
 
 I.
 FACTS
 
 6
 There is no dispute as to the facts. Laurel, a Maryland corporation, owned a harness racing track and operated harness race meets, pursuant to a license granted to it by the Maryland Racing Commission at Laurel, Maryland.[2] During the relevant time period of this suit, from October 8, 1974, through March 25, 1976, there were 125,000 shares of the common stock of Laurel issued and then outstanding which stock was held by approximately 300 stockholders. The common stock of Laurel was thinly traded on the public market. While defendant Hutchison was president of Laurel, he executed an agreement to sell his common stock to defendants Steven Sobechko, James Sobechko and Joseph Shamy for $43.75 per share. At that time he owned a majority of Laurel's common stock or approximately 67,662 shares. According to the Complaint, the then-prevailing market price for a share of Laurel common stock fluctuated between $7.50 and $10.00 per share. On that same date, Hutchison allegedly caused the trio purchasing his stock to similarly extend the $43.75 per share offer to certain designated minority shareholders. The plaintiffs were not included in the designated group to receive the beneficence of Hutchison.
 
 
 7
 The actual stock transfer from Hutchison to the Sobechkos and Shamy occurred on May 12, 1975. The plaintiffs discovered the pending stock transfer just before it occurred through a news article on April 27, 1975.
 
 
 8
 Next, between May 12, 1975, and November 5, 1975, while Laurel was under the control of the Sobechkos and Shamy, some unspecified portion of their common stock was transferred to defendant Mike Brown. The foursome continued in control of Laurel.
 
 
 9
 Finally, on March 25, 1976, the Sobechkos, Shamy and Brown transferred their stock and the controlling majority of Laurel to defendant Daniel J. Rizk. This was the final stock transfer involved in this litigation.
 
 
 10
 Summarily, the plaintiffs sought recovery of monetary damages for the loss in value of their common stock in Laurel due to the alleged breaches of the duty to investigate and the breach of the equal opportunity rule.
 
 II.
 THE DUTY TO INVESTIGATE
 
 11
 Plaintiffs contend that a majority shareholder who sells the controlling interest in a corporation owes a fiduciary duty to the minority shareholders to investigate the character, integrity, financial stability and managerial ability of the prospective purchasers where such a seller is in a position to foresee the likelihood that the purchasers will defraud, loot or mismanage the company. And, on appeal, plaintiffs point to four factual circumstances which they argue were of sufficient gravity to place a duty upon Hutchison to investigate the purchasers of his stock.
 
 
 12
 First, a significant premium was paid to Hutchison for the price of his stock. Second, the actual closing on the Hutchison-Sobechko-Shamy transaction was scheduled to take place at some time from six to twelve months following the execution of the stock purchase agreement. Third, the contract precluded any change in the financial condition of Laurel pending closing on the transaction between Hutchison and the Sobechkos and Shamy. Fourth, Hutchison arranged for certain designated minority shareholders, not including the plaintiffs, to have their shares purchased by the Sobechkos and Shamy. Plaintiffs have cited no Maryland state court decision squarely on point, but rely upon our decision in Swinney v. Keebler Company, 480 F.2d 573 (4th Cir. 1973). They argue that the four "suspicious circumstances" set forth above were sufficient to indicate a likelihood of fraud would exist if the transfer was completed from Hutchison to the Sobechkos and Shamy.
 
 
 13
 The defendants counter by arguing that under Maryland law, minority shareholders have no individual right to recover from former majority stockholders for any alleged breach or breaches of the duty to investigate. They argue that, in reality, the suit is one to recover for mismanagement of Laurel, and such a recovery can be obtained only by a direct suit by the corporation itself, or by having the interests of the corporation advanced in a stockholders' derivative action.[3]
 
 
 14
 Alternatively, defendants argue that even if there is a duty to investigate under Maryland law, under the facts in this case, the four suspicious circumstances set forth above were neither suspicious nor sufficient to place Hutchison on notice of the likelihood of fraud by the Sobechkos and Shamy.
 
 
 15
 We adhere to our decision in Swinney, supra, and although we likewise have been unable to locate any Maryland state court decision directly on point, we believe the district court reached a correct result through its application of Swinney and its legal estimate of what the Maryland state courts would do if presented with this case. This suit was properly dismissed.
 
 
 16
 Under ordinary circumstances, a director or an officer of a corporation has the same right as any other stockholder to buy or to sell his stock. See Llewellyn v. Queen City Dairy, Inc., 187 Md. 49, 58-9, 48 A.2d 322 (1946); Swinney v. Keebler Co., 480 F.2d at 577. However, if, as this court noted in Swinney :
 
 
 17
 ". . . the sellers of control are in a position to foresee the likelihood of fraud on the corporation, . . . or on the remaining stockholders, at the hands of the transferee, their fiduciary duty imposes a positive duty to investigate the motives and reputation of the would-be purchaser (or purchasers); and unless such a reasonable investigation shows that to a reasonable man no fraud is intended or likely to result, the sellers must refrain from the transfer of control."
 
 
 18
 480 F.2d at 578; McDaniel v. Painter, 418 F.2d 545, 547-8 (10th Cir. 1969).
 
 
 19
 Applying Swinney to the four circumstances set forth by plaintiffs which are alleged to be "suspicious", we hold that upon this record, they are insufficient to state a claim upon which relief could be granted.
 
 
 20
 First. While the price paid for Hutchison's shares was indeed a premium price, it was nevertheless a premium paid for the element of control of the corporation. McDaniel v. Painter, 418 F.2d at 548. The premium payment is further justifiable since Laurel was a commercial business subject to further development as an on-going business. Thus, the premium price paid to Hutchison cannot be said to be so unreasonable as to place him on notice of the likelihood of fraud on the corporation or the remaining stockholders. Swinney v. Keebler Co., 480 F.2d at 578-79; Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F.Supp. 22, 26 (E.D.Pa.1940). Finally, as a matter of logic, it seems farfetched to pay a 400% Premium for stock simply in order to acquire control of a corporation in order to loot it. Certainly a cheaper corporate enterprise could be acquired for such malevolent purposes.
 
 
 21
 Second. It is true that the written agreement between Hutchison, the Sobechkos and Shamy provided that closing on the agreement was scheduled for some time from six to twelve months following the execution of the agreement. Third. It is also true that the agreement precluded any change in the financial condition of Laurel pending closing on that transaction. We hold that these two factors, whether taken alone or in conjunction with the premium price paid to Hutchison, are not sufficiently suspicious in this case to invoke Swinney 's duty to investigate. This argument was not entertained by the court below, and we would not ordinarily pass on it. However, it is clear to us that postponing the closing to attempt to obtain financing through a pledge of personal assets for a personal loan,[4] together with a contractual guarantee from the seller to the buyers to preserve the financial condition of Laurel pending closing, constituted prudent business practice rather than "suspicious" circumstances. The agreement essentially preserved the Status quo Of Laurel while allowing the purchasers to shop for financing favorable to them.
 
 
 22
 Fourth. It is true that Hutchison arranged for the purchase of some, but not all, of the outstanding minority shares of Laurel, and that the plaintiffs were not included in this group who were given the option to sell at the higher price received by Hutchison. From this, plaintiffs argue that Hutchison had some reason to believe that the future plans of the Sobechkos and Shamy were not in the best interests of Laurel and its minority stockholders. Defendants counter by noting that selling one's own stock and including others in such a sale, is a private act, sanctioned in law, and not alone "suspicious." We agree. Llewllyn v. Queen City Dairy, Inc., 187 Md. at 60, 48 A.2d 322; Cf. Ace Development Co., Inc. v. Harrison, 196 Md. 357, 365-6, 76 A.2d 566 (1950).
 
 
 23
 Thus, we believe that no duty to investigate should, upon the record now before us, have been placed upon Hutchison in his transfer of control to the Sobechkos and to Shamy, and Count I of the Complaint was properly dismissed. We further hold that the remaining counts of the Complaint were properly dismissed by the district court.
 
 
 24
 Count II alleged the transfer of "a portion" of stock from the Sobechkos and Shamy to Brown. (Complaint, Count II, paragraph 38). No allegation of a transfer of "control" was set forth in this count of the Complaint, and no duty to investigate arose absent a transfer of control. Swinney v. Keebler Co., 480 F.2d at 578.
 
 
 25
 Count III alleged the transfer of control from the Sobechkos, Shamy and Brown to Rizk through sale of their stock to Rizk. However, as the district court held, there were no allegations of suspicious circumstances to place a duty to investigate upon the trio of the Sobechkos, Shamy and Brown in their sale of control to Rizk. Accordingly, dismissal here was proper also.
 
 
 26
 Finally, Count IV dealt only with allegations of mismanagement on the part of defendant Rizk. As above-noted, the mismanagement claims have been abandoned, and in any event, no transfer of control was alleged from Rizk to any transferee, nor was a breach of the duty to investigate alleged. Accordingly, dismissal of Count IV was also correct.
 
 III.
 EQUAL OPPORTUNITY
 
 27
 The plaintiffs further argue that Hutchison, as the seller of the controlling shares of Laurel, owed a fiduciary duty to the minority shareholders of Laurel, including the plaintiffs, to afford them an equal opportunity to sell their minority shares or a Pro rata part of their shares to the purchaser of the controlling stock on the same or substantially the same terms and conditions which were offered to Hutchison. If the offer to purchase the minority shares is extended, then the minority shareholders have the option to sell their shares or a Pro rata portion of them at that price, or to continue their investment in the corporation, despite the transfer. Further, it is argued that such a rule would bar the controlling shareholder from securing an advantageous business arrangement for himself while abandoning the minority shareholders to the mercy of the new purchasers who would not control the corporation.
 
 
 28
 Plaintiffs cite no Maryland law precisely on point, but instead argue that the equal opportunity rule should properly follow from the Maryland law which prohibits a controlling stockholder from using his control for some ulterior purpose adverse to the interests of the corporation and its stockholders. See, e. g., Cooperative Milk Service, Inc. v. Hepner, 198 Md. 104, 81 A.2d 219 (1951); Baker v. Standard Lime and Stone Co., 203 Md. 270, 283, 100 A.2d 822, 829 (1953) (dictum).
 
 
 29
 Plaintiffs rely upon three decisions from other jurisdictions in support of the equal opportunity rule: Jones v. H. F. Ahmanson & Co., 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); and Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 328 N.E.2d 505 (1975); Perlman v. Feldman, 219 F.2d 173 (2nd Cir. 1955), Cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). See also, Andrews, Stockholder's Right to Equal Opportunity in the Sale of Shares, 78 Har.L.Rev. 505, 515 (1965).
 
 
 30
 Defendants counter that the rule of equal opportunity, while nice theoretically, is simply not the law. Neither the Maryland cases cited, nor the Jones, Donahue or Perlman cases, Supra, support such a holding. See also Jararas, Equal Opportunity in the Sale of Controlling Shares: A Reply to Professor Andrews, 32 U.Chi.L.Rev. 240 (1965).
 
 
 31
 The district court distinguished Jones, Donahue and Perlman and held that the Maryland courts would not adopt the equal opportunity rule. We agree.
 
 
 32
 First, the equal opportunity rule has been rather soundly rejected. McDaniel v. Painter, 418 F.2d at 548 and n.13. Second, the rule, if applied, would likely result in the stifling of many financial transactions due either to a purchaser's inability to purchase the additional shares, or from a lack of inclination to purchase those shares. See Andrews, 78 Har.L.Rev. at 517; Jararas, 32 U.Chi.L.Rev. at 425-6; Letts, Sale of Control Stock and the Rights of Minority Shareholders, The Business Lawyer, January, 1971, at 631.[5]
 
 IV.
 CONCLUSION
 
 33
 At oral argument, plaintiffs' counsel pointed to additional facts not in the record, which indicated that various of the purchasers of Hutchison's stock Could have engaged in conduct that would, if proven, constitute serious misconduct, perhaps even conduct which was criminal in nature. These facts are not before us. Accordingly, we confine our result in this case to the facts now before us, and leave the plaintiffs open to pursue any remedies which may yet be available to them. Cf. Standard Oil Co. of California v. United States, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976).
 
 The judgment is
 
 34
 AFFIRMED.
 
 BUTZNER, Circuit Judge, dissenting:
 
 35
 The dismissal of the minority shareholders' complaint for failure to state a claim upon which relief can be granted departs from sound precedent governing both the procedural and substantive aspects of this action. The complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6) on the bare pleadings without consideration of any evidence presented by either affidavit or discovery. Under these circumstances the allegations must be accepted as true and construed favorably to the complainant. A motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Since the motion to dismiss did not satisfy these exacting standards, it should have been denied. I base this conclusion on the following principles of substantive law.
 
 
 36
 * Contrary to the appellees' contention, the district court quite properly recognized that when the harm done to minority shareholders is distinct from the harm done to the corporation, the minority are not relegated to bringing a derivative action on behalf of the corporation. The allegation of discriminatory treatment charged a harm peculiar to the minority shareholders. It permeates all their claims and distinguishes this case from those involving only corporate injury on which the appellees rely. See Jones v. H. F. Ahmanson & Co., 1 Cal.3d 592, 81 Cal.Rptr. 592, 597-99, 460 P.2d 464, 469-71 (1969); 13 Fletcher, Cyclopedia of Corporations § 5913 (1970).
 
 
 37
 The district court also correctly recognized that majority stockholders have a fiduciary obligation to the minority when they transfer control of a corporation to outsiders. Their fiduciary status places them under a duty not to proceed with the transfer if the circumstances surrounding the transaction would awaken the suspicions of a prudent businessman. Then, the majority stockholders must make a reasonably adequate investigation and refrain from the transfer unless they can reasonably conclude that no fraud is intended or likely to result. See Swinney v. Keebler Co., 480 F.2d 573, 578 (4th Cir. 1973); 13 Fletcher, Cyclopedia of Corporations § 5805 (1970).
 
 
 38
 If my analysis of this case is correct, the district court erred by holding that the complaint alleged no suspicious circumstances that would obligate the majority stockholder to make the investigation that the rule requires. The district court reached this conclusion by erroneously construing the allegations against, rather than in favor of, the complainants in violation of the familiar principles reiterated in Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 
 
 39
 In Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F.Supp. 22 (E.D.Pa.1940), the leading case dealing with the fiduciary obligations of majority stockholders upon transfer of control of a corporation, the court pointed out that a suspicious circumstance was the inflated price or premium paid for control. The district court distinguished Insuranshares on the ground that it involved an investment corporation while the instant case concerns the sale of a race track. It then construed the allegation concerning the 400 percent premium over market value paid by the purchasers of the stock against the complainants by concluding that the allegedly excessive payment was simply "a price paid for the element of control."
 
 
 40
 No allegation of the complaint supports the court's assumption about the value placed on control. The court's conclusion might ultimately be sustained by the evidence, but I find no warrant for presently holding without any proof whatsoever that this is the only inference that can be drawn from the payment of such an excessive premium. To the contrary, it might well reflect the real value of the stock, especially if assets carried at cost have increased in value. A reasonably astute businessman should at least investigate the likelihood that the purchasers were willing to pay such a large premium so they could convert corporate assets to their own use, as they allegedly did here. Moreover, the conclusion that the premium simply reflected the price of control is dispelled by the allegation that the majority stockholder insisted that the purchasers acquire the stock of certain favored minority stockholders. Other stockholders, including the appellants, were not even told of the proposed transaction. The use of such leverage to favor one group of minority stockholders over another justifies the inference, at least at this stage of the proceedings, that the majority accurately foresaw that disaster was likely to befall the corporation. These allegations, in my view, provide a sufficient basis for the minority stockholders' claim that the majority breached its fiduciary duty by transferring control without taking the precaution of investigating the purchasers. For this reason alone I would vacate the order of dismissal.
 
 II
 
 41
 Another aspect of the case warrants vacating the order of dismissal and remanding for disclosure of all the facts about the transfer of control. The minority stockholders do not complain simply that they were denied an equal opportunity to sell on the same terms as the majority. Their complaint also alleges that the majority breached its fiduciary duty by causing the purchasers to offer a premium price to certain minority stockholders who were selected by the majority, but not to other minority stockholders. The minority's reliance on state law rather than the federal securities acts does not defeat their claim that the majority had a duty to refrain from discriminating among minority stockholders. Their possible lack of standing to assert a federal cause of action because they neither bought nor sold stock in reliance on the transfer of control has no bearing on this state-based claim.
 
 
 42
 It is generally recognized that holders of the same class of stock are to be treated equally by the corporation and its management. Hagerstown Furniture Company v. Baker, 155 Md. 549, 142 A. 885 (1928). Persons in control of a corporation are similarly obligated not to use the power of control to discriminate among different holders of the same class of stock. I have found no case in Maryland or in any other jurisdiction holding that persons in control of a corporation have an unqualified right to discriminate or to abet discrimination among different holders of the same class of corporate stock.
 
 
 43
 The only case that appears to have dealt with this situation is Ferraioli v. Cantor, 281 F.Supp. 354 (S.D.N.Y.1968). There the court said:
 
 
 44
 In view of plaintiff's claim that the defendants offered to some stockholders the opportunity to sell their General Baking stock to Goldfield at a premium and did not make the same offer to others, including the plaintiff, defendants are not entitled to summary judgment dismissing plaintiff's complaint. 281 F.Supp. at 356.
 
 
 45
 Ferraioli has been criticized as an example of the application of the equal opportunity theory, but apart from that, observant commentators have noted the issue that it raises when the minority stockholders are treated unequally. See 6 L.Loss, Securities Regulations 3615 (1969); Kaplan, Fiduciary Responsibility in the Management of the Corporation, 31 The Business Lawyer 883, 908-09 (1975); Schiff, Sale of Control, 32 The Business Lawyer 507, 514-15 (1977); Schwartz, The Sale of Control and the 1934 Act: New Directions for Federal Corporation Law, 15 New York Law Forum 674, 694 (1969).
 
 
 46
 I believe that the minority stockholders' allegation that the majority used its leverage to favor some minority stockholders over others states a claim that is sufficient to survive a motion to dismiss under Rule 12(b). A thorough exposition of the facts may, of course, disclose that the majority and the preferred minority were in fact a unit such as the members of the corporation's management and their families or business associates who acquired the stock as a joint venture. See 2 L.Loss, Securities Regulations 779 (1961); Kaplan, Fiduciary Responsibility in the Management of the Corporation, 31 The Business Lawyer 883, 909 (1975). At this stage of the proceedings, however, the record does not suggest such a unitary relationship. It therefore seems to me that the disadvantaged shareholders should be allowed to present proof that the majority breached its duty to all minority stockholders by unjustifiably preferring one group over another.
 
 III
 
 47
 A third reason for vacating the order of dismissal is based on the corporation's unique status as a racetrack licensee. Insuranshares suggests that the nature of the corporation's business is a factor to be considered in assessing the majority stockholder's duty to investigate the persons who wish to acquire control. 35 F.Supp. at 26. I think that this factor is particularly relevant to this case. The complaint alleges that the corporation operated a racetrack pursuant to a license granted by the Maryland Racing Commission. This license, of course, was one of the most valuable assets of the corporation, for without it no races could be run.
 
 
 48
 The importance that Maryland places upon the integrity and competency of persons controlling a licensee is indicated by the requirement that the names of its stockholders be disclosed and by the authority of the commission to suspend or revoke a license "for any cause whatsoever which the Commission may, in its discretion, deem sufficient." 7A Md. Code Ann. Art. 78B §§ 10 and 13(c)(1) (1975 Repl.Vol. and 1977 Supp.). Since the competency and integrity of new owners will have an important bearing on the future of the corporation, it seems to me that majority stockholders who sell control of a race track have a fiduciary obligation to make a sufficient investigation to assure the minority that the license will not be placed in jeopardy by the new owners. The majority are bound to know that if the new management is corrupt or incompetent, the commission can suspend or revoke the track's license. See Southern Maryland Agricultural Assoc. v. Magruder, 198 Md. 274, 81 A.2d 592 (1951).
 
 
 49
 In short, the peculiar nature of this corporation's business is another reason for concluding that reasonably prudent business practices required an investigation of the purchasers.
 
 
 50
 No Maryland case addresses the fiduciary obligations of majority shareholders who sell their interest in a corporation licensed to conduct a race track, and quite understandably, the appellants did not press this point in argument. Nevertheless, the allegations of the complaint are sufficient to raise it. Moreover, I am confident that if the question were presented in a state forum, the Court of Appeals would consider the importance of having Maryland race tracks controlled by honest, competent persons to be one of the factors bearing on the scope of the fiduciary obligation of majority shareholders.
 
 
 51
 Consequently, for the three reasons which I have mentioned, or any one of them, I think the complaint should not have been dismissed for failure to state a claim. I respectfully dissent.
 
 
 
 [1]
 Count IV alleged mismanagement against defendant Rizk. However, the plaintiffs abandoned the claims of mismanagement which were set forth in various parts of the four counts of the Complaint below. No mismanagement claims are urged in this appeal
 
 
 [2]
 Annotated Code of Maryland, Art. 78 B
 
 
 [3]
 As noted previously, the mismanagement claims have been abandoned. We are not presented with claims which would derivatively benefit Laurel, but are presented with personal claims of the plaintiffs for their individual damages
 
 
 [4]
 The facts presented in this case differ markedly from those presented in Insuranshares, supra. There, the assets of the corporation were pledged for a personal loan rather than pledging personal assets for a personal loan. 35 F.Supp. at 25. Other much more "suspicious" circumstances also were present in Insuranshares
 
 
 [5]
 We note that a corollary issue to the equal opportunity question is implicitly raised in this case: whether a majority stockholder can use his leverage to favor some of the minority stockholders, by obtaining extension of a favorable sale offer for them, or whether he has a fiduciary duty to treat all minority stockholders equally. The only case in which this issue has been decided is Ferraioli v. Cantor, 281 F.Supp. 354 (S.D.N.Y.1968), where the court, in denying defendants' motion for summary judgment in action by minority stockholders for alleged fraud by controlling stockholder and others, held that allegation that opportunity to sell stock at advantageous terms was offered to some, but not all, of minority stockholders, may constitute a cause of action under the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. 281 F.Supp. at 356-58. No authority was cited for this holding. The court expressly declined to reach the issue of the equal opportunity rule, Id. at 357, but decisions following Ferraioli have treated the case primarily as a statement of that rule and have rejected it as unsound. E. g., Christophides v. Porco, 289 F.Supp. 403 (S.D.N.Y.1968); Haberman v. Murchison, 331 F.Supp. 180 (S.D.N.Y.1971), Aff'd, 468 F.2d 1305 (2d Cir. 1972). It should also be noted that, in these latter cases, plaintiffs were held to have no standing to state a claim for damages under 15 U.S.C.A. § 78j(b) or Rule 10b-5, whose protection extends only to individuals who have Purchased or Sold stock in reliance upon or because of some fraud or deceit. Christophides v. Porco, 289 F.Supp. at 406, 408; Haberman v. Murchison, 468 F.2d at 1313
 Without addressing the soundness of the rule espoused in Ferraioli v. Cantor, supra, we find that plaintiffs in the instant case would have no standing to raise this issue under Md.Corp. & Ass'ns Code Ann. § 11-301 (1975), formerly Md.Ann.Code art. 32A, § 13 (1971), which contains language virtually identical to that in Rule 10b-5. It is clear that the statute affords protection to an injured buyer of securities, although arguably not to an injured seller. Brune, "Rule 10b-5 and the General Law as to Deceit in Securities Transactions in Maryland," 33 Md.L.R. 129, 138-41 (1975); Goodman v. Poland, 395 F.Supp. 660, 680-82 (D.Md.1975). Plaintiffs fall into neither category. In similar vein, we find no support in existing case law for importation of a Ferraioli -inspired common law cause of action where plaintiffs have neither purchased nor sold their stock in reliance upon alleged misconduct. See Llewellyn v. Queen City Dairy, Inc., supra (action in deceit will lie for a defrauded seller); Shulton, Inc. v. Rubin, 239 Md. 669, 212 A.2d 476 (1965) (action for recission will lie for a defrauded buyer).