(47 App. Div. 613.)

TREADWELL v. UNITED VERDE COPPER CO. et al.

(Supreme Court, Appellate Division, First Department. February 9, 1900.)

MINES AND MINERALS—CORPORATIONS—DISSOLUTION—NOTICE OF SALE—INJUNC-TION.

Defendants had advertised a sale of corporate property, after dissolu-tion, by publishing, November 28th, in an obscure place in a law journal, a single notice that the sale would occur December 19th, and mailed copy thereof to each stockholder. The property consisted of a mine, together with real estate, ore on dumps and in transit, bills receivable, etc., valued at nearly $100,000,000. One of defendants owned 244,000 shares out of a total of 300,000, and his relatives and the other directors owned the bal-ance, except about 1,000 shares, 700 of which petitioner owned. A bidder could not safely bid without information as to the extent and nature of the property, the amount of ore in transit, of bills receivable, and of the liabilities to be assumed, and a much longer time than given by the notice was required to ascertain such facts. The notice also provided that on any bid exceeding $3,000,000 the auctioneer could require a deposit of cash or certified check, or a certificate of 10 per cent. of the company's capital stock. *Held*, that plaintiff was entitled to an injunction restraining the sale on the notice given.

Appeal from special term, New York county.

Petition by George A. Treadwell for injunction to restrain a sale of the corporation's property after dissolution against the United Verde Copper Company and others. From an order vacating an injunction, plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Charles M. Demond, for appellant.
Henry G. Atwater, for respondents.

RUMSEY, J. The action was begun on the 8th of November, 1899. The plaintiff is one of the stockholders of the United Verde Copper Company, a New York corporation, owning a large and valuable copper mine in the state of Arizona, which it has been en-gaged in operating. The defendants, other than the corporation, are its directors and stockholders. It is alleged that on the 23d of August, 1899, the directors voted to dissolve the corporation, pur-suant to section 57 of the stock corporation law (chapter 932, Laws 1896), and that their action was confirmed by the stockholders on the 23d of September, 1899; that the certificate required by section 57 was filed in the office of the secretary of state on the 2d day of October, 1899; and that, therefore, pursuant to the operation of the statute, the corporation was dissolved, and it became the duty of the directors to proceed to adjust and wind up its business and affairs,

to carry out its contracts, and to sell its assets at public or private sale, and to apply the same in discharge of debts and obligations of such corporation, and, after paying and adequately providing for the payment of such debts and obligations, to distribute the balance of the assets among the stockholders of the company, according to their respective rights and interests. The complaint states that the capital stock of the corporation was divided into 300,000 shares, of the par value of $10 each, of which the plaintiff is the owner of about 700, the defendant William A. Clark of 244,026, and the other directors and Clark's relatives of enough to bring their joint ownership to something over 299,000 shares. It is alleged in the complaint that the property of the corporation in the territory of Arizona is of very considerable value; that for some time dividends have been paid at the rate of $1 a share a month, or at the rate of $3,600,000 a year; that the mines owned by the company are the most valuable copper mines in the world; that it has accumulated a very large surplus, in excess of $12,000,000; that a body of ore great enough to permit profitable mining for many years to come still remains to be mined; that the assets of the company are many times in excess of its liabilities; and that its property is worth more than $90,000,000. It is further alleged that the ostensible purpose of the dissolution of the company is to reorganize under the laws of the state of West Virginia, and to transfer the property of the defendant to the new corporation after its reorganization, but that the real purpose is to wipe out the interest of the plaintiff and the smaller stockholders, who are not in any way related to or controlled by Clark, in such a way that he shall become the owner of all of the property and assets of the company; that, though the surplus assets of the corporation are much greater in value than the amount of its liabilities, it is the intention of the directors to issue bonds to the amount of $3,000,000, thus imposing a liability to that amount on the corporation which does not exist now. It is alleged, further, that it is the intention of the directors to dispose of all this valuable property and the assets in such a way as to allow William A. Clark alone to obtain them, without regard to the rights or interests of the minority stockholders; that the defendant directors do not intend to have a fair and impartial sale of the assets, but intend to sell them in Arizona or elsewhere, at public or private sale, without adequate or proper notice, and intend that all bidders for the property shall be excluded except Clark or persons acting in his interest. It is said that the plaintiff's stock, which is of the par value of $10 a share, is actually worth $300 a share, amounting in all to over $186,000. The complaint contains many other allegations, setting forth efforts which have been made to compel the sale by the plaintiff of his stock in the company, and threats made by the directors to destroy the plaintiff's interests in case he did not come into the proposed reorganization. As all these threats are denied, the case will be considered without reference to them.

Substantially all the allegations hereinbefore stated are conceded by the defendants, except those as to the value of the property, and

the intention of the directors as to the sale and the object of the dissolution. The defendants do not deny in their answer that portion of the complaint which states that the value of the property is $90,000,000. They concede that the property is of very great value, and, while Clark and the other defendants deny that they have been offered $100,000,000 for the property and have refused it, they do not undertake to say what the property is worth, so that it must be deemed to be admitted that, although the allegations of the plaintiff as to the value of the property may not be accurate, yet it is of exceedingly great value, and worth many times the par value of the stock. The allegations of the complaint that it is the intention of the directors that the sale shall not be a fair one are denied, although the defendants concede that it is their duty to make a sale and distribution of the assets among the stockholders.

In regard to the sale, the undisputed facts are that the intention of the dissolution was to further the scheme of reorganization, and that it was not originally intended that the property should be actually sold at all, but that the West Virginia corporation should be organized by the same persons who are now stockholders of the New York corporation, and that each of them should receive a share of the new company's stock for each share he now holds, so that in the end the company should exist precisely as it now exists, and the business be carried on in precisely the same way, except that instead of being a New York corporation it would be a West Virginia one. As part of the scheme, it was also proposed that $3,000,000 in bonds should be issued to represent the surplus, which the defendants admit to be upwards of that sum, and that one bond of $10 should be delivered to each stockholder for each share of stock he now owns, and that as so delivered it should represent the surplus now owned by the New York corporation, and which should become the property of the West Virginia company. This scheme of reorganization depends, of course, upon the consent of all the stockholders, and as a minority, holding about 700 shares, refused to join in it, it became impossible to carry it out, and it then became the duty of the trustees of that corporation to sell the property. The papers upon which the motion is made show that a notice of sale, including the terms of it, were published in the Law Journal in an obscure place, on the 28th of November, announcing that the sale would take place on the 19th of December then ensuing; that no other notice of the sale was published, nor was any other notice given, so far as appears, except the mailing of the notice of sale and the terms thereof to the stockholders. These facts are not denied. An examination of the terms of sale shows that the property to be sold comprised all the property of the company at Jerome, Ariz., including, in addition to the real estate, all the mining rights and buildings, the ore on dumps, and stores and supplies of every nature used in connection with the mines and the works, and contracts for sale of metal, and also the entire issue of the stock and bonds of the United Verde & Pacific Railway, running from the works to Jerome Junction, consisting of 3,000 shares of stock, of the par value of $100 a share, and 300

first mortgage bonds, of the par value of $1,000 each, and that all these things are to be sold together, and not separately, and the purchaser is required to accept the property as it exists at the time of taking possession, with the ore, stores, and supplies on hand as they may then exist. He is also required to assume all contracts existing at the date of taking possession, made by the company for the purchase of stores, supplies, material, and labor, or the sale of the products of its mines and works, and to pay all bills for the same falling due on or after the day of taking possession, and shall have the right to collect and receive all amounts due the company for the product of its mines in transit to purchasers at the day of taking possession. He is required, moreover, on any bid in excess of $3,000,000, at the option of the auctioneer, to make either a deposit of 10 per cent. of the bid in cash or certified check, or a deposit of certificates of 10 per cent. of the shares of the capital stock of the company, and the auctioneer may refuse to accept such bid if such deposit is not made.

It appears, and is not denied by the trustees of the dissolved company, that it is still engaged in carrying on the business of the mines and making contracts and purchasing stores and hiring labor necessary for that purpose; that there is in the possession of the company copper ore amounting to thousands of tons; that there is also in transit to customers a large amount of ore to fill contracts, and that there is due to the company considerable amounts upon these sales, which vary from time to time, and which cannot be accurately stated at any one time; that no inventory has been made, and that no information is attainable by the plaintiff, or by any one else, as to the nature of the contracts, the supplies on hand, the copper on hand or in transit, or the amount due on the sales, or the amount of the contracts which, by the terms of sale, the purchaser will be required to assume. Whatever information has been asked for on that behalf has been refused. Nevertheless, the defendants insist that when the sale is made it will be fair, because they say that the "stockholders' purchasing and reorganization committee will protect the stockholders' interests, and bid in the property, unless some outsider bids more than they think it is worth, and the committee's bid will be for the benefit of every stockholder who desires to join with them." It is further stated that, if any stockholder refuses to take the stock of the new corporation, all the directors can do is to give him his pro rata share of what the property brings at the sale. In view of the fact that the trustees are made trustees for all of the stockholders, and in view of their statement that they will act only for the benefit of those stockholders who choose to join them, it is quite apparent that, so far as that committee is concerned, they will bid off the property only in the interest of those who desire to become owners in the new corporation, and will not exert themselves to secure any larger price than is necessary to enable them to become the owners of the new corporation, and, as subsequently stated in the affidavit, if the plaintiff does not choose to come into the reorganization, he will receive on his stock only his share of the price they get.

It is made to appear, and affidavits were hardly necessary to establish the fact, that no person who was desirous of bidding on this very valuable property could safely do so unless he had information as to the extent and nature, not only of the visible property in Arizona, but of the property which is represented by the copper in transit and the bills receivable, and also as to the extent of the liabilities which he is bound to assume pursuant to the terms of sale. It is also clear that, to enable the proposing bidder to get such information, a considerable time would be necessary; and it must be conceded, also, that where the property to be sold is of so great value as this, and comprises so many different things, it cannot be expected that bidders would be prepared to attend the sale who had received simply a notice of sale less than four weeks beforehand. It is necessarily to be inferred from these papers that this sale so made could not begin to produce anything like the value of the property.

The notice of sale also provided that on any bid in excess of $3,000,000 the auctioneer might require a deposit of cash or certified check, or a deposit of a certificate of 10 per cent. of the capital stock of the company, as stated above. While this provision authorizes the auctioneer to require only one or the other, at the option of the purchaser, it is quite apparent that it gives to any one who happens to own 10 per cent. of the stock a great advantage over all other persons, and all bidders of $3,000,000 or over must put up either the cash or the stock. As the law requires the trustees to sell the property so as to produce a fund to be distributed, it is apparent that allowing a purchaser to deposit 10 per cent. of the bid in stock is not within the intention of the statute.

The property which is to be sold at this auction is not only real estate and personal property, but also bills receivable, presumably from solvent debtors, and probably presently payable. What reason there can be for including in this sale such quick assets, whose amount can necessarily only be known to the directors of the corporation, cannot be conceived, and for this alone the sale should be restrained until the amount of these assets could be ascertained, so that one bidding on them could have knowledge of what it was. Taking into consideration the great value of the property to be sold, which is confessedly many millions of dollars; the short time of the advertisement; the comparative secrecy in regard to the time and place of sale; the absolute ignorance in which every one except the directors is kept as to the value of a large part of the property to be sold; the nature of the property which is to be sold together, including real estate, supplies, tools, ore on the dumps, and in transit, assets receivable, and subject to liabilities unascertained and practically unascertainable; the terms of sale, which are more favorable to the trustees, who desire to bid for the consenting stockholders, than for any one else; and the fact that the reorganization committee, which proposes to bid in behalf of the stockholders for the purpose of protecting their interests alone, is not disposed to secure any larger price for the property than is necessary to merely bid it in,—it seems to us that, without going any further, a case

is made which would not only authorize, but require, the court to restrain this sale until such time as the terms of sale are so amended as to be unobjectionable, or such information made accessible to all persons desiring to bid, so that an intelligent bid can be made for the property. It is necessarily to be inferred from the facts alleged in the complaint, which are not denied, that this cannot at present be done, and therefore the complaint sets out a cause of action in that behalf, at least, and shows that the plaintiff is entitled to a temporary injunction in regard to these matters.

By the statute the directors are made trustees for the stockholders, and as such it is their duty to administer the affairs of this trust in the interest of all, to the same extent, and in the same manner, as other trustees are required to administer the estate in the interest of their cestuis que trustent. While all charges of unfairness and of any intention to destroy the plaintiff's interests are denied, and have not been considered upon this appeal, yet it does not appear that the plaintiff will not be able to establish them on the trial; and, if he should, there can be no doubt that the court not only would have power, but it would be its duty, to take this property out of the hands of the trustees, and place it in the hands of a receiver, in order that the rights and interests of the stockholders might be alike properly protected. Not only, therefore, does the complaint state a cause of action, but the undisputed allegations in it, coupled with the facts conceded by the defendants themselves, show that the plaintiff's rights absolutely require an injunction to restrain this sale, which, if conducted in the manner proposed, must necessarily produce a great sacrifice of the property of the corporation, and a great destruction of the plaintiff's interests.

The order vacating the injunction should therefore be reversed, with $10 costs and disbursements, and the injunction continued, with $10 costs of the motion. All concur.