272 N.J. Super. 140 (1994)
639 A.2d 390
LOIS GRATO & THOMAS GRATO, PLAINTIFFS-RESPONDENTS/CROSS-APPELLANTS,
v.
LOUIS GRATO, WILLIAM GRATO, STEPHEN GRATO, GRATO & SONS TRUCKING COMPANY, INC., EASTERN MOTOR FREIGHT, INC., G & S INDUSTRIES, INC., AND INTERNATIONAL MOTOR FREIGHT, INC., DEFENDANTS-APPELLANTS/CROSS-RESPONDENTS. LOIS GRATO & THOMAS GRATO, PLAINTIFFS-RESPONDENTS/CROSS-APPELLANTS,
v.
LOUIS GRATO, WILLIAM GRATO & STEPHEN GRATO, DEFENDANTS-APPELLANTS/CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1994.
Decided April 6, 1994.
*141 Before Judges BAIME, CONLEY and VILLANUEVA.
*142 Patrick T. Collins argued the cause for appellants (Franzblau, Dratch & Friedman, attorneys; Stephen N. Dratch, of counsel; Steven Pasternak, on the brief).
Les Bierman, attorney, argued the cause for respondents (Mr. Bierman, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
This appeal and cross-appeal involve the dissolution of closely-held family corporations and the continuation by defendants, majority shareholders, of the business under a different corporate name. The trial judge concluded defendants' conduct breached their fiduciary duties and awarded plaintiffs the value of their interest in the business as it has been continued under the new corporate name. Defendants appeal; plaintiff Lois Grato cross-appeals her award based upon a 10% interest in the business, as opposed to 15%. We affirm the conclusion of a breach of fiduciary duty under the peculiar circumstances here, but conclude that valuation of plaintiffs' interest in the business should have been based upon the value of the business as it operated under the old corporate entities just prior to their dissolution.[1] We find no merit to the cross-appeal and affirm that aspect of the final judgment without further comment. R. 2:11-3(e)(1)(E).
The parties' business relationships concern three corporations and a partnership engaged in the trucking business. In 1976, Grato & Sons Trucking Company, Inc. (Grato) was formed; its place of business was out of Lois and Louis, Sr.'s residence in Palisades Park. One hundred shares of stock each were issued to Lois and Louis, Sr., and ten shares of stock each were issued to two of their sons, Louis and William. Eventually, their two other sons, Stephen and Thomas, joined Grato and became shareholders. *143 William was the leading salesman and was in charge of all the business and finances for Grato. Lois performed bookkeeping services, some selling and handled a number of accounts. Louis was the mechanic and Steven was the dispatcher. Thomas performed a variety of lesser tasks, including driving.
At the end of 1981, because of the company's growth, Grato moved to a new location in Port Newark, where it used a trailer that it had bought as an office. On June 14, 1983, the family entered into a shareholders' agreement providing for a division of the shares of Grato in the following manner: William, twenty-five percent; Louis, twenty-five percent; Steven, twenty percent; Thomas, fifteen percent and Lois, fifteen percent. The agreement placed a limitation on the transfer of stock on a voluntary or involuntary basis, and set terms and conditions for valuing the stock upon transfer.[2]
In November 1984, Lois and Louis, Sr. separated; this separation led to difficulties in the company. Also leading to tension in the relationship between Grato's owners was the hiring of Berney Kleinhandler in early 1985. Kleinhandler had his own trucking company located in the yard next to Grato's, and his business was mostly with liquor accounts. Business increased as a result of the hiring of Kleinhandler  Grato went from grossing around $700,000 a year to almost $2,000,000 a year  and the company physically expanded. However, Lois developed an intense dislike of Kleinhandler. This in turn led to arguments between William and Lois over Kleinhandler's role in the company.
In June 1985, the family members formed a partnership, G & S Industries (G & S), for the purpose of the purchase, ownership and maintenance of a trailer. Holding in G & S was divided as follows: William, twenty-five percent; Louis, twenty-five percent; *144 Stephen, twenty percent; Thomas, fifteen percent and Lois, fifteen percent. The family's trucking business was operated out of the trailer and Grato paid monthly rent to G & S for its use.
In October 1985, one of Grato's trucks was involved in a serious accident in New York. As a result, an action was filed against several parties, including Grato (hereinafter referred to as the Matthews action). Because Grato only had a one million dollar insurance policy, concern over the lawsuit among the family was "tremendous." Grato's insurance company informed them that because of the seriousness of the injuries to Mr. Matthews, a verdict could be in the area of 10 to 12 million dollars and that the "overwhelming" percentage of liability would be attributed to Grato and its driver.
In November 1985, and to provide protection from a judgment in the Matthews action, the family members formed a new corporation, Eastern Motor Freight, at an initial capitalization of $10,000. Holding in Eastern was divided as follows: William, thirty percent; Louis, twenty-five percent; Stephen, twenty percent; Thomas, fifteen percent; and Lois, ten percent. Eastern operated out of the same address as Grato, with the same employees and the same customers. It is not clear whether any trucking business continued in the name of Grato from the time Eastern was established, or whether all business from that point on was conducted in the name of Eastern.
Because of the continuing disputes between Lois and William, in February 1987, a family meeting was held at which William stated that either he or Lois had to leave the workplace because of the conflicts between the two. All the brothers apparently sided with William. Soon after, Lois agreed to stay at home in return for her full salary, medical and pension benefits and credit cards. But when the sons cut off her credit cards, Lois returned to work at Eastern in July. Her return was brief; on July 8, 1987 after a shareholders' meeting, defendants, as majority shareholders, terminated her employment. They also terminated Thomas' employment as a result of attendance and work performance problems.
*145 These activities on the part of defendants led to the filing of a Law Division action by plaintiffs on July 15, 1987 claiming wrongful termination. A subsequent Chancery Division complaint was filed in September 1987 alleging the terminations constituted oppressive and unfair action.[3] Plaintiffs sought restoration to their former positions at Grato/Eastern. Consistent with the claims of oppression and unfairness, they alternatively sought various relief available pursuant to N.J.S.A. 14A:12-7(1)(c), including the appointment of a custodian. The complaints were later consolidated under the Chancery docket in December 1987 and the request for the appointment of a custodian was denied, as was the request for reemployment. Discovery was stayed, pending exchange of financial information "with the object of attempting to arrive at a value of the corporations and the plaintiffs' respective interests in same."
Thereafter, defendants filed an application to purchase plaintiffs' interest in the corporation pursuant to N.J.S.A. 14A:12-8. By order filed February 5, 1988, that application was granted and provided for a written offer within 10 days.
The statutory buy-out procedure was then begun. On February 11, 1988 defendants proposed a buy-out of Lois' interest for $88,950 and Thomas' interest for $94,250. The basis of the offer was an appraisal that valued Grato at $525,000, Eastern at $105,000 and G & S at $5,000. The offer was rejected on March 2, 1988. Plaintiffs took the position that "according to [their] appraisal expert," the value of the corporations was two and a half million dollars, making Thomas' interest worth $375,000 and Lois' "substantially more." Given the vast divergence in the respective values of the business, the next step in the statutory buy-out procedure would have been a hearing and determination by the trial judge. See N.J.S.A. 14A:12-7(8)(c).
*146 That never occurred. On June 29, 1988, a 7.5 million dollar judgment was filed in the Matthews litigation; Grato and the driver Rodino, were determined to be 80% responsible. The judgment was ultimately affirmed March 23, 1989. It has, we are told, been fully paid by other partially culpable parties who have cross-claims for indemnity against Grato. To what extent these claims are active or viable, we have not been told. We note, however, no party has attempted to disagree with the trial judge's observation in his oral decision on damages on June 18, 1992 that "[a]t this stage and after all that has happened, it seems highly unlikely that the Matthews' creditors are likely to attack IMF [International Motor Freight][4] as some kind of shell for Grato. It's now just about four years since that judgment was recovered. If the plaintiffs in that case haven't made that move by now; it seems unlikely that they will in the future. Certainly, it it [sic] is apparently or it seems clear that William, Louis and Stephen also think it's unlikely, otherwise it seems highly doubtful to me that they would have invested this kind of money and time and made these kinds of commitments for IMF."[5]
In any event, immediately following the Matthews judgment, defendants withdrew their buy-out offer and commenced a course of conduct upon which the allegations of oppression and unfairness must focus.
Earlier, in April 1987 and during the on-going disputes between Lois and William and during the pendency of the Matthews *147 litigation, Louis had, on his own and unbeknownst to anyone else, formed another corporation, International Motor Freight (IMF). He did so for "security." As he explained "I seen what was going on at the time.... Meaning the relationship. The judgment.... And the accusations made by [plaintiffs' attorney] and [plaintiffs]." He did nothing with the corporation, however, until June 1988 when he advised William and Stephen and together they activated the business. He did so at that time because "[i]t was the right time.... I did not like how [Grato/Eastern] was run. I didn't like the two partners that were in it. I did not want to continue going into business with them ... by me going out and forming that company, I did not have to recognize Thomas Grato or Lois Grato as a partner...." As activated, IMF simply continued the business of Grato/Eastern almost simultaneous with their dissolution.
The trial judge's findings and conclusions in his oral decision of February 11, 1991 in this respect, are critical and are entirely supported by the evidence. We set them forth at length:
Now, essentially simultaneously with the beginnings of International's operation, in or around August, 1988, and extending into January, 1989, most of the assets that had been held by Grato and Eastern were disposed of. They were sold. Many of the sales were to International, although there were a number to other entities.
International's operations were taking place in the same office, the same trailer where Grato and Eastern had operated. In those same quarters there were now three corporations functioning, Grato, Eastern and International, although operations were gradually being phased entirely into International. Thus, for example, Lisa Guzman, an office worker, said that part of her job was to transfer all computer records from the Grato corporation to International. She established new accounts and new records for all customers who had been Grato customers who were now set up as International customers. She was doing most of her work for International, but in fact, she was being paid by Grato. She did billing for both corporations. If she had telephone calls to make to collect accounts receivable, she made those calls for either or both corporations, whichever was appropriate.
Now, while this ongoing operation with three corporations was continuing, and the assets of Grato and Eastern were being sold, William, Louis and Stephen caused a Meeting Notice dated October 13, 1988 to be served on Lois and Thomas. The notice was a call for a stockholders' meeting of the shareholders of Grato and Eastern to take place on October 27, 1988. The notice said that the subject of the meeting would be to propose dissolution of Grato and Eastern. That meeting did *148 take place on October 27, 1988, and Louis, William and Stephen voted their shares in favor of dissolving both corporations, and that vote carried.
Now, that was on October 27, 1988, but as I noted, in fact, that dissolution was already in motion. The sale of the assets that I described (the assets consisting primarily of trucks) had been going on for about two months since in or around August, 1988. I'll come back to that in a few moments.
By now, today, as we sit here, the phase-in of International and the phase-out of Eastern and Grato has been long completed. The business is now operating completely in the form of International under the name of International, and it seems to be operating very well, indeed.
In 1989, business was good enough to provide, as I said, a salary of $200,000 for Williams, Louis and Stephen. The corporation today, operating as International, operates essentially the way Grato, and also Eastern for that matter, had operated. It's at the same location where Grato had operated. It deals with many of the same customers, although certainly some customers have left for one reason or another, and other new customers have been added. Mr. Kleinhandler continues to work for International in the same trailer where Grato had functioned, and he does that in the same way he had functioned for Grato. William, Louis and Stephen do essentially what they had previously done for Grato.
In short, the location is the same, the address is the same, the business is the same, and the business has continued to thrive and grow. Most of the trucks, indeed all of the trucks owned by Grato and Eastern have been sold, many of them purchased by International and a few sold to third parties.
As the trial judge later wrote in his July 17, 1991 decision concerning an appropriate remedy, "defendants could presumably have established a totally new business. They did not do that. Rather, they simply picked up the old business (partly owned by the plaintiffs) and converted it to a business owned exclusively by them."
Particularly troublesome, is the fact that while the Grato/Eastern business and assets, customer lists, and employees, were being transferred to IMF, plaintiffs' corporate oppression complaint pursuant to N.J.S.A. 14A:12-7 was still pending and, until the transfer was completed, plaintiffs were never advised that a substantial amount of Grato assets were sold to IMF or that customer lists and other intangible assets of the business had been taken over by IMF. They were advised by notice of a shareholders meeting in October 1988, only of defendant's intent to dissolve Grato/Eastern.
*149 By order entered October 25, 1988, the trial court appointed a special fiscal agent for Grato/Eastern and G & S. We have not been provided with the application or other documents which may have been submitted to the trial judge and which led to this appointment, but it is fairly evident from the order that neither the trial judge nor plaintiffs were, at that time, made aware of defendants' then ongoing plans to transfer the business of Grato/Eastern to IMF. Indeed, in this respect, while defendants by letter dated October 27, 1988 advised the special fiscal agent of their intent to dissolve Grato/Eastern and G & S, and thereafter, apparently kept him advised of the progress of the dissolution, nowhere in that letter is the fiscal agent told of what was planned for the family business. In fact, although much reference was made during the trial to meetings and discussions with both the fiscal agent and plaintiffs concerning the dissolution process, nowhere are we told that defendants' plan to continue the business under a new corporate shell was ever disclosed until it was a fait accompli.
As the trial judge observed in his written decision of July 17, 1991 denying defendants' motion for reconsideration of his liability decision:
Bear in mind, that at the time defendants activated International Motor Freight ("International"), this case was well underway and was pending in this court. In fact, plaintiffs had already moved to have the court fix a fair price at which plaintiffs would be required to sell their interest in the business to defendants. They had even submitted an offer of what they claimed to be a fair price, only to withdraw that offer after the Matthews judgment was recovered.
A motion to this court, simply advising all concerned as to what defendants proposed to do, would have been simple. An offer, with a proposed dollar amount, to be paid to plaintiffs in full settlement of all their interests in Grato and Eastern and all of the assets of both those corporations, could have been submitted. A clear and unequivocal statement to the court that defendants intended to create a new business (on the same location, with all of the same equipment, customers, employees, etc.) and continue operating without defendants, would have been a simple method of clearing the deck and leaving defendants free to proceed.
Had defendants done that, presumably this court or any court would have found that plaintiffs had some monetary interest which had to be resolved before defendants could move on as they wished to do. That issue could have been decided and put to rest. Any required payment could have been made or if defendants had disagreed, either with the determination that they had to make a *150 payment to plaintiffs, or with the amount of that payment, they could have appealed. One way or another, the issue would have been resolved.
Defendants, of course, did none of those things. Rather, they simply usurped what had been the business of Grato and Eastern; gave that combined business a new name; took full ownership for themselves; and proceeded to operate the business by and for themselves on  what can conservatively be called  a very profitable basis.
The alternatives set out above represent what reasonable "business judgment", together with a sense of integrity and a recognition of the rights of other stockholders, would have called for. There was not  there seldom is  an irreconcilable conflict between good business judgment and honoring one's fiduciary obligations to those to whom those obligations are owed.
Finally, on this point, I note that defendants in fact had submitted a valuation and offered to purchase plaintiffs' interest in Grato. They withdrew that offer, and claimed that the appraisal was not effective because of the Matthews judgment.
In fact, however, their actions subsequently indicated that such was not the case. There was indeed value in the family business, and substantial value at that. What had to be done in order to realize the benefits of that value (and what defendants actually did) is to recast that business in the form and under the name International Motor Freight. The Matthews judgment had not totally destroyed the value of the family business at all. Rather, it had merely necessitated the reincorporation of the business and its restructuring under a different title and a different form  but with the same substance.
Thus, defendants' decision not to proceed with their offer to purchase plaintiffs' stock, and their withdrawal of that proposal was a deliberate choice on the part of defendants. It was not something forced upon them by any external compulsion.
In challenging the trial judge's liability conclusions, defendants argue that the trial judge's opinion was based upon an improper application of the "corporate opportunity" concept and erred in the analysis of the "business judgment" rule. We first consider the "business judgment" contention. Defendants contend that in rejecting their business judgment defense (avoidance of the Matthews judgment), the trial judge incorrectly ingrafted onto that concept a requirement of "intrinsic fairness." In doing so, they argue that "[t]o invoke judicial scrutiny of directors' actions, a plaintiff must satisfy his burden of demonstrating a prima facie showing of fraud, dishonesty or incompetence. Sarner v. Sarner, 62 N.J. Super. 41, 60 [162 A.2d 117] (App.Div. 1960), rev'd on other grounds, 38 N.J. 463 [185 A.2d 851] (1962); Papalexiou v. Tower West Condominium, 167 N.J. Super. 516, 527 [401 A.2d 280] (Ch.Div. 1979). Absent such a showing, the judiciary should not *151 disturb or second-guess corporate action, because the directors are presumed to have exercised their sound business judgment. Sarner, 62 N.J. Super. at 60 [162 A.2d 117]; Exadaktilos v. Cinnaminson Realty Co., Inc., 167 N.J. Super. 141, 151 [400 A.2d 554] (Law Div. 1979), aff'd, 173 N.J. Super. 559 [414 A.2d 994] (App.Div. 1980)."
We need not consider whether in all circumstances, the actions of majority shareholders in a closely held corporation are or are not limited by this version of the "business judgment" rule. We doubt that they are. But here the factual findings of the trial judge, which are amply supported by the record, Rova Farms Resort v. Investors Ins. Co. of America, 65 N.J. 474, 483-84, 323 A.2d 495 (1974), cast defendants' actions in the mold of "freeze-out maneuvers". Under these circumstances, what was long ago observed in Exadaktilos v. Cinnaminson Realty Co., 167 N.J. Super. at 154, 400 A.2d 554, in connection with N.J.S.A. 14A:12-7, is particularly pertinent:
Thus, the statutory language embodies a legislative determination that freeze-out maneuvers in close corporations constitute an abuse of corporate power. Traditional principles of corporate law, such as the business judgment rule, have failed to curb this abuse. Consequently, actions of close corporations that conform with these principles cannot be immune from scrutiny. To implement the intent of the Legislature, a method must be developed whereby it can be decided when a particular course of corporate conduct has resulted in the oppression of a minority shareholder.
Simply put, judicial consideration of a claim of majority oppression or freeze-out in a closely held corporation is guided by considerations broader than those espoused in defendants' version of the "business judgment rule". E.g., Walensky v. Jonathan Royce Intern., Inc., 264 N.J. Super. 276, 281, 624 A.2d 613 (App.Div.), certif. denied, 134 N.J. 480, 634 A.2d 527 (1993); Bostock v. High Tech Elevator Indus., Inc., 260 N.J. Super. 432, 443, 616 A.2d 1314 (App.Div. 1992). See also Brenner v. Berkowitz, 134 N.J. 488, 503, 634 A.2d 1019 (1993), And see Brundage v. New Jersey Zinc Co., 48 N.J. 450, 470, 226 A.2d 585 (1967); Berkowitz v. Power/Mate Corp., 135 N.J. Super. 36, 45-46, 342 A.2d 566 (Ch.Div. 1975). As we have recently said, the business judgment rule "is a rebuttable *152 presumption, and the burden shifts to the defendant to show the intrinsic fairness of the transaction in question upon the showing of self-dealing or `other disabling factor'." Maul v. Kirkman, 270 N.J. Super. 596, 614, 637 A.2d 928 (App.Div. 1994).
Defendants also contend that the trial's judge's liability conclusions are based upon an improper application of the "corporate opportunity" concept. As we have said, in his February 11, 1991 oral decision, the trial judge found that defendants did not simply begin a new business, rather they transferred the business of Grato/Eastern to IMF. He said:
They did all of that through the use of their power and status as the controlling shareholders in Grato and Eastern. The ability to organize International and to phase all of the operations and the ongoing business of Grato and Eastern into International was an opportunity available to the defendants because of their status as the controlling majority stockholders of Grato and Eastern....

It's clear that the defendants took that business opportunity which they saw as available to the stockholders of Grato and Eastern. The difficulty is that they did not make that opportunity available to all of the shareholders of Grato and Eastern. Rather, they took it to themselves and they froze out the interests of the minority stockholders, Lois and Thomas. In doing that, I am convinced that they violated their fiduciary obligations to the minority stockholders.
[emphasis added].
If the basis of the trial judge's finding of liability were premised upon what is frequently referred to as the corporate opportunity doctrine, and as might be suggested by the above underlined portion of his decision, we agree with defendants that it does not fit here. That doctrine has been described in the following fashion:
[I]f there is presented to a corporate officer of [sic] director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.
[Valle v. North Jersey Auto. Club, 141 N.J. Super. 568, 573, 359 A.2d 504 (App.Div. 1976), modified, 74 N.J. 109, 376 A.2d 1192 (1977) (quoting Guth v. Loft, 23 Del. Ch. 255, 272, 5 A.2d 503, 511 (Sup.Ct. 1939))].
See for example Morad v. Coupounas, 361 So.2d 6 (Ala. 1978) (commencement by three shareholders of a competing business in *153 an area into which the existing corporation would have expanded, constituted a usurpation of a corporate opportunity that should have been made available to the existing corporation).
Here, IMF was not a business venture defendants took from Grato/Eastern to the exclusion of that corporation. They did not usurp an opportunity: they usurped "the entire going business status of an ongoing functioning entity."
We do not, however, view the trial judge's ultimate decision as premised upon the concept of corporate opportunity. It is plain to us that the heart of the judge's determination was his finding that defendants "usurped what had been the business of Grato and Eastern; gave that combined business a new name; took full ownership for themselves; and proceeded to operate the business by and for themselves on  what can conservatively be called  a very profitable basis." This finding was coupled with the ultimate conclusion that their "decision not to proceed with their offer to purchase plaintiffs' stock, and their withdrawal of that proposal was a deliberate choice on the part of defendants. It was not something forced upon them by any external compulsion." We think these considerations provided the critical foundation for the ultimate conclusion that defendants breached their fiduciary duties to plaintiffs.
Since it is the manner in which they dissolved Grato/Eastern and G & S and what was done with the business assets, both tangible and intangible, that provides the basis for the judge's conclusion, the proper analysis requires a consideration of what obligations majority shareholders owe to minority shareholders when dissolving a closely held corporation. In this respect, it has been noted in the context of a corporate liquidation:
[W]hile the law allows a majority interest to effect a liquidation of a corporation, the power to cause such extraordinary corporate action may not be exercised without scrupulous loyalty to the interest of minority shareholders. Majority stockholders cannot, under color of a plan of dissolution, appropriate the business of the corporation to the detriment of minority stockholders. As a consequence, majority stockholders cannot vote to discontinue the business of the corporation for *154 the purpose of turning it over to another corporation and excluding minority stockholders from participating therein.
[19 Am.Jur.2d, Corporations, § 2752 (1986)]. See generally, 1 R. Hodge O'Neal and Robert B. Thompson, O'Neal's, Oppression of Minority Shareholders: Protecting Minority Rights, Squeeze-outs and other intracorporate conflicts, § 5:21 (2d ed. 1985); 2 R. Hodge O'Neal and Robert B. Thompson, O'Neal's, Close Corporations: Law and Practice, § 8.07 (3d ed. 1988); 16A William M. Fletcher, Fletcher Cyclopedia of Corporations, § 8022 (1986 per. ed. rev.).
It has been said that "[i]n order to dissolve the corporation without giving rise to an action for breach of fiduciary duty, the majority must demonstrate that (1) no alternative to dissolution was available, and (2) that in dissolving the corporation the majority secured no benefit over the other shareholders." Crain v. Electronic Memories & Magnetics Corp., 50 Cal. App.3d 509, 522, 123 Cal. Rptr. 419, 428 (1975). See Jones v. H.F. Ahmanson & Co., 1 Cal.3d 93, 81 Cal. Rptr. 592, 460 P.2d 464, 473 (1969).
Certainly where a corporation is insolvent and the manner of dissolution provides the minority shareholders with their share of the fair market value of the corporation's assets, judicial interference would not be warranted. See Beach v. Wharton Mining Co., 128 N.J. Eq. 192, 195, 15 A.2d 605 (E. & A. 1940); Tanzer Econ. Assoc., Inc., Profit Sharing Plan v. Universal Food Specialties, Inc., 87 Misc.2d 167, 176-177, 383 N.Y.S.2d 472, 479-81 (Sup.Ct. 1976); Slott v. Plastic Fabricators, Inc., 402 Pa. 433, 436, 167 A.2d 306, 308 (1961); White v. Kincaid, 149 N.C. 415, 417, 63 S.E. 109, 111 (1908). Cf. In re Security Finance Co., 49 Cal.2d 370, 378, 317 P.2d 1, 6 (1957). Moreover, we see no basis to interfere where those circumstances are present, even though the majority shareholders may, on their own, commence a new business. We do not think the notion of fair treatment of a minority shareholder would require the majority to provide "an equal opportunity" to participate in the new venture.
*155 The concept of "equal opportunity" in the context of close corporations and claims of majority shareholder oppression, is illustrated by Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 591, 328 N.E.2d 505, 515 (1975). There it was held that where a close corporation redeems its own stock from one of the controlling shareholders, the controlling shareholders must cause the corporation to offer each shareholder an equal opportunity to sell a ratable number of his shares to the corporation at an identical price. Id. at 598, 328 N.E.2d at 518. This doctrine has been limited in its application, however. See e.g., Clagett v. Hutchison, 583 F.2d 1259, 1263 (4th Cir.1978) (equal opportunity doctrine not applicable to sale of shares by majority stockholder); Kennedy v. Titcomb, 131 N.H. 399, 402, 553 A.2d 1322, 1324 (1989) (equal opportunity doctrine not applicable where shareholders purchase stock from other shareholders); and Toner v. Baltimore Envelope Co., 304 Md. 256, 280, 498 A.2d 642, 654 (1985) (equal opportunity doctrine not applicable where corporation purchased non-voting stock from some shareholders).
We need not determine the appropriate parameters of the "equal opportunity" concept in deciding this case, for the trial judge's conclusion that defendants breached their fiduciary duty was based upon much more than simply not affording plaintiffs an opportunity to participate in a new business. IMF was not a new business, it was the continuation of Grato/Eastern. See Lebold v. Inland Steel Co., 125 F.2d 369, 373 (7th Cir.1941), cert. denied, 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749 (1942); Christner v. Anderson, Nietzke & Co., 433 Mich. 1, 15, 444 N.W.2d 779, 785 (1989); Godley v. Crandall & Godley Co., 212 N.Y. 121, 135, 105 N.E. 818, 823 (1914) (directors "had the right to organize another corporation. It had the right within the limits of fair trade to engage in a competing business with the old corporation. But neither they nor it had the right to enter into and carry out a conspiracy with the directors of the old corporation to acquire the latter's business and good will without paying therefor.").
In this respect, it has been noted that:

*156 [A] question has arisen as to whether a voluntary dissolution, pursuant to a statute, by a majority of the stockholders, is valid where the purpose of the dissolution was to enable the majority stockholders to acquire the corporate property and continue the business in their own interest. Some cases hold that the minority stockholders cannot complain. On the other hand a number of cases hold that if a majority of the stockholders in their own interest vote to sell the assets, discontinue the business and dissolve a viable corporation for the purpose of turning over the assets and business to another corporation controlled by themselves in such a way as to exclude the minority or to deprive them of the fair value of their investment, the minority stockholders, if they act promptly, may have equitable relief in the form of an injunction.
 [16A Fletcher, supra, § 8022 at 174
 (footnotes omitted)].
For instance, in Thibaut v. Thibaut, 607 So.2d 587 (La. Ct. App. 1992), writ denied, 612 So.2d 101 (La. 1993), it was held that defendant partners breached their fiduciary duty to plaintiff partners by engaging in a scheme to dissolve the partnership, transfer its assets and goodwill to defendants' new corporation without disclosing same to plaintiffs and continuing the business in the name of the new corporation. Id. at 603-04. In that case, two groups in the partnership notified each other of their intent to terminate the partnership. Id. at 591. Each group anticipated the continuation of the business and, therefore, set up "shelf" corporations. Id. at 592. Defendant group conducted secret meetings at which they devised their plan to take over the partnership's business upon its dissolution. Ibid. On the same day that the petition for liquidation was filed, the managing partner, a member of defendant group, sent a check to all partners representing their pro rata share of the money available for distribution, discharged partnership employees and shut down its operation, and mailed letters obtained from the partnership's customers list to the partnership's customers informing them of the corporation established by defendant group. Id. at 592-93. Moreover, on the same day, the partnership employees that were fired were hired by the new corporation, and the corporation began serving the same outlets which had previously been served by the partnership. Id. at 593. In finding that the defendant partners' actions constituted a breach of fiduciary duty to the plaintiff partners, a duty that continued until final liquidation, the *157 court stressed that while transferring the business to themselves, defendants did not disclose to plaintiffs "all material facts within their knowledge." Id. at 604. See generally, 1 R. Hodge O'Neal and Robert B. Thompson, O'Neal's, Oppression of Minority Shareholders: Protecting Minority Rights, Squeeze-outs and other intracorporate conflicts, § 5:21 (2d ed. 1985); 2 R. Hodge O'Neal and Robert B. Thompson, O'Neal's, Close Corporations: Law and Practice, § 8.07 (3d ed. 1988); 16A William M. Fletcher, Fletcher Cyclopedia of Corporations, § 8022 (1986 per. ed. rev.).
The right of majority shareholders to dissolve and the corresponding remedies, if any, of minority shareholders is, to put it mildly, a murky area. On the one hand, it is generally recognized that if a dissolution is illegal or fraudulent, a minority shareholder may enjoin it or be entitled to other remedies. On the other hand, and critical here, where there may be no actual fraud or illegibility, but rather an intended "freeze-out," the cases are divergent:
The general rule is that where a statute confers power on a majority, or a certain percentage of the stockholders to dissolve, the right is absolute in the absence of actual fraud, and not subject to judicial review on behalf of minority stockholders. In other words, where a voluntary dissolution is being effected by the officers or majority stockholders, pursuant to a statute, it is only in rare and exceptional instances that it should be stayed or interfered with by the courts at the instance of minority stockholders. Furthermore, fiduciary responsibilities do not require the holders of stock sufficient to command liquidation to sacrifice or jeopardize the security of their investment because of an objection of a minority interest, and where harmonious relations were impossible, liquidation was proper though one of the majority subsequently entered a new business in the field of the former corporation and acquired some of its former employees and accounts. It is generally no ground for interference that the motive prompting the dissolution is reprehensible or malicious, or that the dissolution seems unwise or improvident, or that the court may not approve of the motive in dissolving. The policy and wisdom of the act is held to be a matter of business judgment rather than a question reviewable by the courts, and the courts will not examine into the affairs of the corporation to determine whether the action was expedient or wise....
[16A Fletcher, § 8022 at 173-174, (footnotes omitted)].
Windmuller v. Standard Distilling & Distributing Co., 114 F. 491, 495 (D.N.J. 1902); William B. Riker & Son Co. v. United Drug Co., 78 N.J. Eq. 319, 79 A. 1044 (Ch. 1911), rev'd on other grounds, 79 N.J. Eq. 580, 82 A. 930 (E. & A. 1912); Kirwan v. Parkway *158 Distillery, 285 Ky. 605, 148 S.W.2d 720 (Ct.App. 1941); Green v. Bennett, 110 S.W. 108 (Tex.Civ.App. 1908).
But:
a question has arisen as to whether a voluntary dissolution, pursuant to a statute, by a majority of the stockholders, is valid where the purpose of the dissolution was to enable the majority stockholders to acquire the corporate property and continue the business in their own interest. Some cases hold that the minority stockholders cannot complain.
[16A Fletcher, § 8022 at 174 (footnotes omitted)].
See Rossing v. State Bank of Bode, 181 Iowa 1013, 165 N.W. 254 (1917); Slattery v. Greater New Orleans Realty & Devel. Co., 128 La. 871, 55 So. 558 (1911); White v. Kincaid, 149 N.C. 415, 63 S.E. 109 (1908); Colby v. Equitable Trust Co. of New York, 124 A.D. 262, 108 N.Y.S. 978, aff'd, 192 N.Y. 535, 84 N.E. 1111 (1908); Moore v. Lewisburg, 80 W. Va. 653, 93 S.E. 762 (1917); State v. Chilhowee Woolen Mills, 115 Tenn. 266, 89 S.W. 741 (1905). In all of these cases, there was some reason for the dissolution in addition to a freeze-out, and no dispute but that the minority shareholders received fair value for their interest, or were permitted to exchange that interest for an equivalent interest in the new corporation.
It has also been observed that:
On the other hand a number of cases hold that if a majority of the stockholders in their own interest vote to sell the assets, discontinue the business and dissolve a viable corporation for the purpose of turning over the assets and business to another corporation controlled by themselves in such a way as to exclude the minority or to deprive them of the fair value of their investment, the minority stockholders, if they act promptly, may have equitable relief in the form of an injunction.
....
Even where the dissolving stockholders act in accordance with the letter of the statute, they must do so in good faith. The courts should and will interfere at the instance of minority stockholders where the dissolution is in bad faith and violates the rights of minority stockholders, or where it has been induced by undue influence or is the result of fraud, or, it would seem, where the dissolution is not intended for the benefit of the corporation or in furtherance of its interests but merely to unjustly oppress the minority, or any of them, and cause a destruction or sacrifice of their pecuniary interests or holdings.
[16A Fletcher, § 8022 at 174-175 (footnotes omitted)].
*159 See Kavanaugh v. Kavanaugh Knitting, 226 N.Y. 185, 123 N.E. 148 (1919); Greenfield v. Denner, 6 A.D.2d 263, 175 N.Y.S.2d 918 (1958), rev'd on other grounds, 6 N.Y.2d 867, 160 N.E.2d 118, 188 N.Y.S.2d 986 (1959); Treadwell v. United Verde Copper Co., 47 A.D. 613, 62 N.Y.S. 708 (1900); Ervin v. Oregon Ry. & Nav. Co., 27 F. 625 (C.C.N.Y. 1886); Ribakove v. Rich, 13 Misc.2d 98, 173 N.Y.S.2d 306 (Sup.Ct. 1958); Levy v. Billeaud, 443 So.2d 539 (La. 1983); In re Paine, 200 Mich. 58, 166 N.W. 1036 (1918); Weisbecker v. Hosiery Patents, 356 Pa. 244, 51 A.2d 811 (1947); Theis v. Spokane Falls Gas Light, 34 Wash. 23, 74 P. 1004; reh'ing denied, 36 Wash. 690, 78 P. 299 (1904); May v. Midwest Refining Co., 121 F.2d 431 (1st Cir.), cert. denied, 314 U.S. 668, 62 S.Ct. 129, 86 L.Ed. 534 (1941) (applying Maine law).
Neither party has cited any New Jersey cases concerning dissolution and rights of minority shareholders in closely held corporations. There are a few old cases that would suggest that unless fraud or illegality is shown, courts will not interfere. See Windmuller v. Standard Distilling & Distributing Co., supra, 114 F. at 495; Reade v. Broadway Theatre Co. of Long Branch, 99 N.J. Eq. 282, 288, 132 A. 477 (Ch. 1926); Riker v. United Drug Co., supra, 78 N.J. Eq. at 324-325, 79 A. 1044. Clearly this would no longer be so today. See Brundage v. New Jersey Zinc. Co., supra, 48 N.J. at 470, 226 A.2d 585 (in the context of a merger "even though it complies procedurally with the statutory requirements, must also satisfy basic equitable requirement of good faith and fair treatment"). And see generally, Walensky v. Jonathan Royce Int'l, supra, 264 N.J. Super. at 281, 624 A.2d 613, Bostock v. High Tech. Elevator Indus., supra, 260 N.J. Super. at 443, 616 A.2d 1314. See Brenner v. Berkowitz, supra, 134 N.J. at 503, 634 A.2d 1019.
The dissolution here by defendants was a transfer of the old business to the new corporation to the exclusion of plaintiffs. Plainly defendants' self-interests motivated the scheme. Close scrutiny is required. That is precisely what the trial judge did here. We agree with his final conclusion of breach of fiduciary duty. We recognize the existence of the Matthews judgment and *160 the impact that may have upon the corporation. But we are troubled, as was the trial judge, by the fact that when the Matthews judgment was imminent, defendants nonetheless offered the statutory buy-out procedure. It looks very much as if they seized upon the entry of that judgment to dispose of plaintiffs' interests as cheaply as they could through the dissolution process. It is undisputable that a shareholder's interest in a business under a buy-out procedure will have a higher value than in dissolution, for the "good will" or value of the business is not reflected in the latter. See e.g., Noakes v. Schoenborn, 116 Or. App. 464, 841 P.2d 682, 688 (1992); Kellogg v. Georgia-Pacific Paper Corp., 227 F. Supp. 719, 724 (W.D.Ark. 1964) ("To say that majority stockholders may dissolve a corporation and proceed to take over the business and principal assets for themselves while at the same time forcing the minority to take mere cash for their interests, the payments to be based on a valuation made by the majority, would be to confer upon the majority the power to confiscate the minority interest, thus depriving the minority shareholders of their interest in an existing business with its attendant possibilities of growth and appreciation in value, an interest which may be worth much more than the present cash value of the minority shares...."); Rossing v. State Bank of Bode, supra, 165 N.W. at 260-61; Godley v. Crandall & Godley Co., supra, 105 N.E. at 823.
And when defendants seized upon the event of the entry of the judgment to move to the maneuver of a dissolution, they most assuredly were less than candid with plaintiffs and the fiscal agent concerning their evident plan to continue the business of Grato/Eastern under IMF. As a result, instead of receiving fair value for their shares, plaintiffs were stuck with the significantly lower dissolution value keyed solely to the sale of the tangible assets. We recognize plaintiffs have not challenged the fair market value of these sales. But we do not think that is fatal.
It remains for us to deal with the remedy. We disagree with the trial judge that plaintiffs' damages should be measured by the value of IMF. They have no legal right to participate in *161 that corporation and we note that they never participated in its capitalization  a financial burden that only Louis, the corporation's sole stockholder, has borne. An oppressed minority shareholder's remedy is both statutory and equitable. Brenner v. Berkowitz, supra, 134 N.J. at 503, 634 A.2d 1019. We do not think it fair that plaintiffs reap the benefits of something they had no right to insist upon. But, under the particular circumstances, not the least of which is the fact that defendants commenced the buy-out procedure at a time they knew the Matthews judgment was imminent, we think the appropriate remedy is the value of plaintiffs' shares in Grato/Eastern based upon those corporations' value prior to June 1988. Any such award, however, must reflect a credit for the monies plaintiffs received from the sale of assets.
Defendants have contended that if that is the appropriate remedy, the record is sufficient for such a determination. We have carefully read all of the expert valuation testimony and are not able to draw that conclusion. We think the trial judge, in the first instance, should do so. If he deems the testimony not properly geared toward such valuation, he may schedule a valuation hearing. We here comment briefly upon the parties' shareholders' agreement for Grato. It appears that agreement contained a valuation procedure for transfer. It may be that that procedure might be helpful upon remand. Cf. Bostock v. High Tech. Elevator Indus., supra, 260 N.J. Super. at 440, 449, 616 A.2d 1314.
We briefly comment on the remaining contentions. We have carefully considered defendants' contention that plaintiffs waived their claims by not objecting to the dissolutions and accepting the proceeds from the sale of the assets. We conclude it is clearly without merit. R. 2:11-3(e)(1)(E). Given our disposition, defendants' remaining claims concerning the damage award are moot.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] Because we have reached a different view as to the appropriate remedy, we do not recite in this opinion the evidence presented on damages and neither do we address defendants' contentions concerning the damage award.
[2] The agreement itself is not contained in the record. No mention is made in the record regarding articles of incorporation or by-laws of any of the corporations involved in this case. As we will later mention, the valuation method upon transfer may become critical in ascertaining the proper amount of damages.
[3] Lois' and Thomas' claim of wrongful termination was ultimately rejected by the trial judge. No issue as to this determination has been raised in this appeal.
[4] International Motor Freight is the corporate entity through which defendants have carried on the family business.
[5] We note, however, the trial judge's earlier observation in his February 11, 1991 oral decision on liability that:

the judgment itself states that the party that paid that judgment, known as Interpool, has a right of indemnity for those payments against Grato. Thus, it seems there is still a basis, and what would seem to be a solid basis, for a claim against Grato for most of the amount of the judgment. The second shoe has not yet fallen, and it seems that there may well be a long period of time before anyone can finally relax secure in the knowledge that the second shoe is not going to fall.