**In the Matter of Brenda K. SHARKEY, Debtor.**

**Brenda K. Sharkey, Plaintiff,**

v.

**Bernard D. Emery; Pauline D. Emery; Frank Emery and Power LAN Industries, Inc., Defendants.**

**Bankruptcy No. 96–18303/JHW. Adversary No. 97–1186.**

United States Bankruptcy Court, D. New Jersey.

Nov. 27, 2001.

---

Frederick W. Hardt, Moorestown, NJ, for Debtor/Plaintiff.

Joseph P. Grimes, Grimes & Grimes, L.L.C., Cherry Hill, NJ, for Defendants.

## OPINION

JUDITH H. WIZMUR, Bankruptcy Judge.

In this adversary proceeding, the plaintiff, Brenda K. Sharkey, seeks to recover against the defendants for personal loans she made to Power LAN Industries, Inc., ("Power LAN") deferred salary from Power LAN, and compensatory and punitive damages for corporate mismanagement, fraud and malicious interference with Power LAN clients.

### FACTS

Prior to the incorporation of defendant Power LAN, plaintiff Brenda Sharkey ("Brenda") operated a company known as LAN Technologies, in which she and defendant Bernard Emery ("Bernard") were the two controlling shareholders. Bernard also operated a separate independent company known as Network LAN, which was in the business of marketing computer equipment and services, in which he was the primary shareholder. The two companies worked in conjunction with one another. Network LAN would market computer systems to its customers, and LAN Technologies purchased the computer equipment and provided servicing for the Network LAN contracts.

The shareholders occasionally infused the two companies with additional capital to keep the two businesses running. In early 1990, Brenda borrowed money from her equity line and loaned it to LAN Technologies. On or about December 31, 1990, Brenda again borrowed money, this time $25,000, to lend to the company. The loan was collateralized by Brenda's home.

By the spring of 1992, the operations of the two entities had apparently become so intertwined as to be indistinguishable. Both of the companies had incurred substantial debt. As of December 31, 1991, a combined balance sheet of the two companies showed total assets of $221,337.00 and total liabilities of $388,561.00. By May 1992, LAN Technologies had indebtedness in excess of $300,000, primarily due to Network LAN's failure to pay obligations that it owed to LAN Technologies.

Around May 1992, a financial crisis occurred. Brenda could not cash an $18,000 check to pay for certain equipment that had been ordered by LAN Technologies. Pauline Emery ("Pauline"), Bernard's mother, agreed to borrow monies against her line of credit at Germantown Savings Bank ("GSB") to cover the purchase of the equipment and LAN Technologies' expenses going forward.

With both Network LAN and LAN Technologies in desperate straits, the plaintiff and defendant Bernard deter-

mined to try to continue their business operations by forming a new corporation. They were advised by an attorney, William J. Kearns, Jr., Esquire, to have the physical assets of the two companies appraised and then to purchase the assets and receivables of the old companies at full value. The proposal contemplated that the new corporation would issue a corporate note to the two predecessor corporations (Network LAN, Inc. and LAN Technologies), which note would be payable, with interest, over a period of time. Attempts were also to be made to negotiate with the creditors of the two corporations to pay those creditors over time.

On May 18, 1992, a Certificate of Incorporation was filed for Power LAN, Inc., listing Bernard D. Emery, Pauline D. Emery, Brenda K. Sharkey and Frank J. Emery as the initial board of directors. It does not appear that Power LAN, Inc. ever issued a corporate note to the two predecessor companies. While some of the obligations of the predecessor companies may have been paid, other debts remained unsatisfied. Nonetheless, Power LAN proceeded to operate with the assets and income of the predecessor companies combined.

The new corporate entity was plagued from the beginning with lax corporate formalities and financial accounting problems. The allocation of ownership in Power LAN was never formally established with precision among the parties. The debtor testified that she believed at the outset that she had a 51% interest in the corporation. At Mr. Kearns' office during the first corporate meeting, she claims she was told by Bernard that she had a 3% interest. In subsequent tax returns filed by the company and signed by the debtor, there were various ownership interests reflected.[1] On April 3, 1995, in the context of reviewing a tax return prepared by Darrell Carp, the accountant for the Power LAN company, Brenda indicated in writing to Mr. Carp that she believed that each of the parties, i.e., Bernard, Pauline and Brenda, owned one third of the company. In a certification submitted in September 1995 to the New Jersey Superior Court, Brenda reflected a 50% interest in the company. Yet another version of ownership was reflected in the corporate minutes of an organizational meeting held by Brenda on September 28, 1995, after the breakup of the company. The minutes recognized a 1992 agreement with three of Power LAN's employees which promised each of them a 1% interest in the company, while Brenda and Bernard each held 48½% of the Power LAN shares. Despite the various reflections in the record and understandings of the parties involved, there were never any shares of the company stock issued and no written agreement between the parties about the allocation of shares created. Discussions and arguments about this issue continued among the shareholders throughout the existence of Power LAN.

As to the allocation of work among the three principals, Brenda, Pauline and Bernard, Brenda was generally in charge of operations.[2] She estimated jobs, ordered

---

1. 1992 income tax returns–75% Bernard Emery, 25% Brenda Sharkey. *See* T71–14 to 16, Jan. 6, 1999.

   1993 income tax returns–50%–50%. *See* Trial Exh. P–4.

   1994 income tax returns–50%–50%. *See* Trial Exh. P–6.

2. Although Brenda testified that she never was given any title, she signed as "Vice-President of Operations" on a personal guarantee to Graydon Sherman and otherwise noted titles in various documents, e.g., in the 1992 tax returns as "Operations".

product, dealt with customers and arranged for technical assistance. Pauline was in charge of bookkeeping until Brenda took over the accounting tasks at Pauline's behest.[3] Bernard was in charge of sales and was mostly out of the office. Pauline eventually took over the operations of the training center. There were three to four other employees of the company at various times.

The primary bank account for Power LAN was maintained at Meridian Bank, with all three principals as signatories to the account. In January 1995, the debtor opened a separate account at Jefferson Bank. She was the only signatory on that account, and deposited all Power LAN receipts into the account. Brenda testified that she opened the Jefferson Bank account because Bernard had the habit of writing blank checks or checks for luxuries from the corporate account. Brenda claims that she intended to put Bernard and Pauline on the account, but never did. Only business expenses were paid from the account, although Brenda acknowledged that occasionally, personal expenses may have been paid and counted as salary. She paid all corporate obligations from the account.[4]

It was customary for Power LAN to defer the payment of salary to the principals. Brenda was to be paid a bi-weekly

salary of $1,000.00, but this salary was often deferred or otherwise credited. The debtor estimates that at the time Power LAN broke up in August 1995, she was owed approximately $36,000 in deferred salary. In addition to deferred salary, the debtor also loaned the company some money in August 1992.[5] Notes were prepared and signed by Pauline indicating that the total amount of corporate indebtedness, including loans and deferred salary, due to Brenda was $90,000. Pauline testified that she believed about $16,000 was repaid.[6]

The cash flow of the company was generally maintained by short-term loans from Pauline, who used her various lines of credit and credit cards to cover the operating expenses of Power LAN as necessary. Power LAN would then pay her back by paying her credit card bills when they became due. During the course of Power LAN operations, from her GSB line of credit, which was paid off by a Meridian line of credit and then became a CoreStates line of credit, as well as several credit cards, Power LAN paid Pauline $142,761.51.[7] That is, Power LAN paid to either GSB, Meridian, CoreStates or various credit card companies monies due on a regular basis on Pauline's accounts. The debtor contends that between 1992 and 1996, Power LAN paid Pauline

---

**3.** Pauline testified that Brenda took over the accounting for the company in the beginning of 1993. Brenda testified that she took over sometime in November 1994.

**4.** It appears that Pauline maintained a separate account for the training functions of the company.

**5.** Pauline recalled that Brenda loaned $57,000 into the company. Brenda recalled that she loaned $75,000 from an inheritance she received.

**6.** Although a suggestion was made at trial that by signing the notes, Pauline undertook personal responsibility for repayment to

Brenda, Brenda acknowledged and stipulated through counsel at trial that Pauline signed the notes as a corporate officer on behalf of the corporation.

**7.** A note was signed on June 8, 1994 reflecting an amount due to Pauline of $26,926.56, and indicating that the training programs could be used to fund repayment of the obligation to Pauline. Brenda testified that although her signature appeared on the document, she did not sign that document and suggested that the document could have been a "cut and paste" product.

$195,588.61. The monthly statements of those accounts, for the most part, do not name specific payees. Some of the checks from Power LAN to Pauline's accounts make note of specific obligations, e.g., Power LAN taxes. Some accounts have handwritten notes reflected on the monthly statements written by Pauline to denote the nature of the expense.

In 1995, the relationship among the Power LAN principals deteriorated. In April, the principals became aware that Power LAN was indebted to creditors for up to $36,000. Bernard and Pauline discovered that Brenda was operating the cash flow of the company through the new Jefferson bank account on which she was the only signatory. Brenda discovered that Bernard and Pauline had opened a post office box to accept receipts on behalf of the corporation.

Brenda testified that on August 2, 1995, she received a phone call from Bernard, who was very agitated and indicated to her that "you are done".[8] He demanded that she meet him and Pauline at a local diner. Brenda, having been previously threatened by Bernard, decided to take immediate action.[9] She immediately arranged to move into a small space in Blackwood which was offered by a customer. She hired a truck, took all of the employees except for Bernard, Pauline and the training personnel, took the desks, computers and file cabinets of the employees who came with her, and took the main file server. She left behind one or two file servers that dealt primarily with the company's training services.

The Jefferson Bank account of Power LAN notes that Brenda, the only signatory on the account, withdrew nearly $15,000 from the account on August 3, 1995,[10] the day after the breakup of the company.

After Brenda's departure, each of the now separated parts of Power LAN attempted to continue Power LAN operations. Brenda held an "organizational meeting" on September 28, 1995, along with the three employees who came with her to Blackwood, during which she was appointed the new president of Power LAN. Bernard sent Brenda a letter dated August 28, 1995 informing her that she was terminated from her employment with Power LAN.

After Brenda's departure, two primary contracts remained with Bernard and Pauline, including the Clearview school contract and the Camden County training contract. Following the completion of those contracts, all Power LAN activities ceased. Pauline continued her training services as ComSource, Inc., while Brenda continued her business as Brenda Sharkey and Associates, Inc.

From the earlier days of LAN Technologies, continuing through Power LAN operations, Brenda occasionally guaranteed payments to specific vendors personally.[11] Apparently, neither Pauline nor Bernard signed any such guarantees.[12] Some ven-

---

8. T102–2, Jan. 6, 1999.

9. Two years earlier, a police report was made by Brenda against Bernard for threatening her. The police report reflected that the complaint of "Terroristic Threats" was "Cleared/Closed" due to "Victim/Witness/Refus[al] to Cooperate." Trial Exh. P–22.

10. Trial Exh. D–17.

11. For example, Brenda apparently guaranteed a $31,337.17 bill for equipment from P.C. More, Inc. d/b/a Duracom Computer Systems; a $15,562.31 bill for a RAM memory chip from Telecomputer, Inc., and a $19,056.00 bill for various computer equipment from Tech Data Corporation.

12. A suggestion was made at trial that Bernard may have signed several guarantees, but the record is not clear on that question.

dors of both LAN Technologies and Power LAN received judgments against Brenda, totaling approximately $90,000. At least one creditor of Power LAN appears to have successfully levied against Brenda's account in the name of Brenda Sharkey and Associates, Inc. The Internal Revenue Service charged Brenda as a responsible person in connection with LAN Technologies tax obligations of approximately $55,000. The mortgage Brenda had given on the loan taken out for LAN Technologies and/or Network LAN was not satisfied and was eventually foreclosed upon. Brenda filed for Chapter 11 reorganization on November 4, 1996.

## DISCUSSION

As noted, the debtor filed this adversary complaint against defendants Bernard, Pauline, Frank Emery [13] and Power LAN to recover monies allegedly owed to the debtor, including the recovery of personal loans, deferred salary and other damages. Of the eight count complaint, portions of Counts Two, Three, Four and Eight remain to be resolved. In Counts Two and Three, Brenda seeks judgment against Power LAN in the amount of $54,000 plus interest for "personal loans, guarantees and financial obligations incurred on behalf of Power LAN Industries, Inc", and $36,000 plus costs of suit for deferred salary due to her. In Count Four, Brenda charges Pauline and Bernard with "syphon[ing] off resources of Power LAN limiting the amount of assets available to pay on-going obligations." If Pauline and Bernard are obligated to pay monies to Power LAN under Count Four, then Brenda seeks in Count Eight to compel Bernard and Power LAN to issue Power LAN stock to her, and to enjoin Bernard from interfering with any continuing operations of Power LAN.

Although the trial of this matter was held in 1999, the resolution of the matter was delayed pending settlement discussions. Ultimately, such discussions failed, and the matter was returned to the court's calendar for final decision. Final submissions were received in June 2000.

The parties do not dispute that Brenda is entitled to a judgment against Power LAN on Counts Two and Three. The focus of our attention is Brenda's opportunity to obtain a judgment against Bernard and Pauline, either on her own behalf or on behalf of Power LAN.

## I. Shareholder Derivative Suit or Direct Action.

A stockholder derivative suit allows individual shareholders to bring suit to "enforce a corporate cause of action against officers, directors, and third parties." *Ross v. Bernhard*, 396 U.S. 531, 534, 90 S.Ct. 733, 736, 24 L.Ed.2d 729 (1970). " 'The purpose of the derivative action [i]s to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of "faithless directors and managers." ' " *Strasenburgh v. Straubmuller*, 146 N.J. 527, 548–49, 683 A.2d 818 (1996) (quoting *Kamen v. Kemper Financial Servs., Inc.*, 500 U.S. 90, 95, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949))).

The difference between a "derivative" action by a shareholder on behalf of the corporation, and a "direct" action by a shareholder on her own behalf is best stated in § 7.01 of The American Law Institute's Principles of Corporate Governance:

---

**13.** All counts were dismissed against Frank Emery, Pauline's husband, at trial.

Analysis and Recommendations, which states in relevant part:

(a) A derivative action may be brought in the name or right of a corporation by a holder ... to redress an injury sustained by, or enforce a duty owed to, a corporation. An action in which the holder can prevail only by showing an injury of breach of duty to the corporation should be treated as a derivative action.

(b) A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.

See *Brown v. Brown*, 323 N.J.Super. 30, 36, 731 A.2d 1212 (App.Div.), *certif. denied*, 162 N.J. 199, 743 A.2d 851 (1999).

In *Strasenburgh*, the New Jersey Supreme Court offers this example of conduct that gives rise to both types of actions:

The example is of directors making a worthless investment in untested technology while touting the optimistic potential of the technology. Investors deceived by the recklessly optimistic statements that occasioned shareholders to buy or retain their shares may sue for the direct injuries that they suffered. Shareholders may also sue for the derivative injury to the corporation for the imprudent and wasteful investment in faulty technology. The distinction between the two types of action is crucial.

146 N.J. at 549, 683 A.2d 818. "Concededly, a thin line often separates actions that are derivative or individual." *Id.* at 552, 683 A.2d 818.

The distinction between derivative and individual actions becomes critical primarily in the context of statutorily prescribed procedural requirements to file derivative actions. *See, e.g.,* N.J.S.A. 14A:3–6 (The plaintiff in a shareholder derivative suit must show that a "demand" was properly made on the board of directors.) As well, the distinction is critical to determine whether the recovery inures to the benefit of the corporation or the individual. At least one New Jersey court has blurred the distinction between such actions in closely held corporations. Citing to the Principles of Corporate Governance, the court quoted:

In the case of a closely held corporation ... the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Brown v. Brown*, 323 N.J.Super. 30, 36, 731 A.2d 1212 (App.Div.1999) (quoting § 7.01(d)).

■ For purposes of the causes of action asserted by the plaintiff herein, it is immaterial whether we view the plaintiff's cause as derivative or direct. If the plaintiff is successful in her quest for compensatory and punitive damages against Pauline and Bernard, the defendants will not be exposed to a multiplicity of actions. The corporation is now defunct. Any recovery could be fashioned to account for the interests of the creditors of Power LAN and to distribute proceeds fairly

among interested persons. Therefore, neither the procedural hurdles normally required for shareholder derivative actions nor the concern that the corporation is the appropriate recipient of any remedy will impede consideration of the substance of the plaintiff's cause.

## II. *Allegations of Corporate Mismanagement and Fraud.*

A helpful framework within which to consider plaintiff's allegations that Bernard and Pauline mismanaged the corporation, committed fraud, and otherwise engaged in illegal or improper activity, to the detriment of the corporation and to Brenda's detriment, is the statutory cause of action specifically addressing the plight of minority shareholders in closed corporations. N.J.S.A. 14A:12–7(1)(c) authorizes a court to consider various remedies, including the dissolution of such a corporation, if the following circumstances prevail:

(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.

■■ For purposes of testing Brenda's allegations against the defendants herein, we will consider Brenda to be a "minority shareholder" within the meaning of the statute. In this case, the extent of the debtor's holdings of Power LAN's stock has never been fully resolved, nor can it be from this record. However, it has been held that the extent of a plaintiff's interest in a corporation, even if it is over 50% ownership of the corporate shares, does not preclude designation as a "minority shareholder" within the meaning of the statute. *Bonavita v. Corbo,* 300 N.J.Super. 179, 187, 692 A.2d 119 (Ch.Div.1996). The statute aims to protect shareholders from the abusive exercise of power, and focuses on the relative power and ability of one side to oppress another, rather than on the percentage of stock ownership.

■■ To determine whether the alleged fraudulent, illegal or oppressive misconduct of the corporate officer or director is actionable, the quality and nature of the misconduct must be evaluated. *Brenner v. Berkowitz,* 134 N.J. 488, 508, 634 A.2d 1019 (1993). In particular, courts must consider "whether the misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation". *Id.* at 509, 634 A.2d 1019.

The special circumstances, arrangements and personal relationships that frequently underly the formation of close corporations generate certain expectations among the shareholders concerning their respective roles in corporate affairs, including management and earnings. These expectations preclude the drawing of any conclusions about the impact of a particular course of corporate conduct on a shareholder without taking into consideration the role that he is expected to play. Accordingly a court must determine initially the understanding of the parties in this regard. Armed with this information, the court can then decide whether the controlling shareholders have acted in a fashion that is contrary to this understanding.

*Id.* Additional factors that may warrant consideration include "whether the minority shareholder was aware of the misconduct prior to filing suit but failed to act, and whether the minority shareholder participated in the misconduct." *Id.* at 509–10, 634 A.2d 1019.

In this case, underlying the debtor's contention that Bernard and Pauline "sy-

phoned off resources of Power LAN limiting the amount of assets available to pay ongoing obligations",[14] are three themes, each of which is described below. I conclude that none of the plaintiff's allegations serve to establish a cause of action based on corporate mismanagement, fraud, misapportionment of funds or improper interference with corporate clients.

■ A. Plaintiff contends that substantial amounts of corporate funds were diverted by Pauline to her personal accounts, and that Pauline's advances to the corporation were promptly repaid, while advances from Brenda, both by way of loans to the corporation and deferred salary, were not repaid.

Throughout the course of Power LAN operation, from the inception of operations in 1992 until the breakup of the company in August 1995, the normal operating mode for the company was to borrow money from Pauline for ongoing cash needs, and to pay Pauline back on a regular basis directly to her various bank and credit card accounts. Brenda herself transferred monies from the corporation to Pauline's accounts on several occasions. The company needed access to Pauline's credit to maintain operations, and was accustomed to repaying Pauline in the normal course.

To decipher the complex cash flow of corporate receipts and disbursements of Power LAN, the debtor offered a review of Power LAN records conducted by her forensic accountant, Stephen N. Klein. To justify his conclusions that Pauline must refund to Power LAN substantial sums of money paid by Power LAN toward Pauline's lines of credit and credit cards, Klein relied on two assumptions. First, he assumed that if Pauline could not produce documentation to support expenses she asserted to have been made for the benefit of Power LAN, those expenses did not, in fact, benefit Power LAN, but were simply paid by Power LAN for Pauline's benefit. Second, he assumed that where the sources of repayment of Pauline's lines of credit and credit cards were not specifically noted in Pauline's records, he assumed that the payments came from Power LAN, that they benefitted Pauline personally, and that Pauline is required to refund these payments to Power LAN.

Neither assumption is justified to impose liability on either Pauline or Bernard for payments made by Power LAN. Pauline testified that all charges on the line of credit were for the benefit of Power LAN. On the Meridian account, except for $42,000 to buy her condominium, which Power LAN did not pay for, all monies were used for business. On the charge accounts, the expenses were for both business and personal purposes, and she would examine the bills and arrange for payment of only the business expenses. Her testimony was credible, and was corroborated by notations in the records regarding the nature of many of the expenditures. In many cases, Brenda signed the checks to Pauline's accounts, and the checks themselves reflected the purpose of the payment. In any event, lack of documentation cannot meet the burden of proof in this case to justify the imposition of liability from Pauline to either the corporation or to Brenda directly.

It is true that the loans from Pauline, which were utilized by the corporation on a regular basis, were more consistently and more promptly repaid than the more long-term loans from Brenda to the corporation. There is no clear explanation for that imbalance. However, Brenda shared in the decision making and business judgments exercised by the corporation in

---

**14.** Count Four, Complaint to Recover Money and for Equitable Relief.

terms of repayment of obligations on an ongoing basis. She was fully aware of the conduct of business, including the repayments, and participated in the decisions allocating the corporation's resources.

During the course of the trial, plaintiff attempted to depict herself as a corporate employee who lacked sophistication, and had minimal involvement in the financial affairs of the company. She claimed that she was not knowledgeable about the business dealings of the company, and "did as she was told", by Pauline and Bernard. Brenda's testimony in this regard is totally incredible. The actual picture painted was that of an astute businesswoman who managed Power LAN with precision and sophistication. Following Pauline's request to her that she take over the payment of bills, she did so, and maintained the books and records of the corporation after that point, with full knowledge of all receipts and disbursements, and full participation in all aspects of Power LAN operations.

Brenda established an account for Power LAN with Jefferson Bank in January 1995, on which account she was the only signatory. She paid all of the company's bills from that account, and received revenues on behalf of the corporation into that account. Around the time of the breakup in August 1995, Brenda withdrew most of the money in Power LAN's account, and presumably utilized the money in the business operations she continued at a new location. Within hours of the breakup with Bernard and Pauline, Brenda was able to move the operations of Power LAN, with the exception of the training center, to a new location, complete with Power LAN's main file server and person-al computers, employees, and records, to begin operating in a new location as a turn key operation.[15]

The plaintiff fails to establish liability on the part of either Pauline or Bernard for payments made to Pauline by Power LAN. The record does not support the conclusion that moneys were improperly diverted from the corporation to Pauline, or otherwise misappropriated. In addition, Brenda's central role in Power LAN business operations, and her active participation in the very conduct she complains of, i.e., payment of corporate funds to Pauline, precludes relief to her under these circumstances.

As noted in *Brenner*, the equitable concept of estoppel has been applied to bar relief where a shareholder or director had or should have had knowledge of alleged misconduct but failed to act. 134 N.J. at 510, 634 A.2d 1019. Here, the concept of estoppel may be applied to bar Brenda from attempting to restructure the business decisions she made, along with Pauline and Bernard, regarding the conduct of cash flow, the taking of shareholder loans from Pauline, and the repayment of those loans on a routine basis.

■ B. Plaintiff contends that she personally guaranteed many of the obligations of LAN Technologies, whereas Pauline and Bernard did not, and that she should not be required to shoulder the obligations without the participation of the other corporate principals.

Brenda claims that the extent of her personal guarantees and exposure in connection with Power LAN obligations is

---

**15.** Plaintiff's contention that the books and records of Power LAN were retained by Pauline and Bernard, and were not made accessible to her, was not borne out by the proofs at trial. Although Pauline did have some records of the company, Brenda's removal of the main file server, along with some paper records, represented the key components of the books and records of the company generally. Her complaint about records in Pauline or Bernard's possession cannot be sustained.

$169,584.00. She acknowledges that some of those guarantees date back to obligations of LAN Technologies.

Regardless of the extent of personal guarantees undertaken by Brenda directly in connection with Power LAN, we cannot accept Brenda's invitation to second guess the business decisions she made during the course of Power LAN operations. Indeed, as fellow officers, directors and shareholders, Pauline and Bernard might have been called upon to participate in providing personal guarantees. There is no clear explanation in this record for the imbalance between the principals in accepting personal responsibility for Power LAN debts. However, the decision to sign personal guarantees was made by Brenda. There is no opportunity to parcel out the obligations of the corporation among the other officers and/or shareholders on this record.

■ C. Plaintiff contends that following the August 1995 break up of Power LAN, Pauline and Bernard achieved profits from Power LAN for which they should account to the corporation and/or to plaintiff.

Again, the plaintiff has failed to establish a basis for relief in connection with post-breakup events. The debtor focuses on two contracts, a contract with the Clearview Regional High School for computer sales, and a contract with Camden County for training services. In both cases, the contracts were entered into prior to the August 1995 breakup, and were serviced and executed by Bernard and Pauline following the breakup. Bernard and Pauline collected the proceeds of the contracts. Brenda contends that they must be accountable to the corporation and/or to her from proceeds collected. The facts established at trial do not support plaintiff's contention.

As to the Clearview contract, Pauline testified credibly that shortly before the breakup, a purchase order for $137,000 was received by Power LAN. Pauline loaned moneys to Power LAN to finance the cost of goods for the contract. Following the breakup, Bernard effected the contract over the next several months, earning a profit of approximately $18,000, which was given to him as a salary for his efforts. The record is unclear as to the extent to which Pauline was repaid for her advances. However, because the financing of the contract, and the implementation of the contract, were actually accomplished by Pauline and Bernard, there is no basis in this record to warrant an accounting and sharing of the proceeds with Brenda.

As to the Camden County training contract, Pauline operated the training center aspect of Power LAN operations separately from the sales portion of the company. A letter signed by both Brenda and Pauline dated June 8, 1994, confirms that "a separate profit center" was created with the express "consideration", or purpose, of the payoff of a loan to Pauline.[16] Brenda's testimony that she did not sign the document was not credible.[17] The services in connection with the training contract for Camden County were performed largely, if not entirely, following the breakup in August 1995. The check made out to Power LAN, the licensee for Camden County's training efforts, in the amount of $18,330,

---

16. Trial Exh. P–29.

17. Nothing on the face of Exhibit P–29 reflects any alteration. Pauline's testimony, that at the time the letter was signed, she was routinely loaning money to the corporation, and that moneys were due to her, is confirmed by all parties. She explained credibly that the letter of June 8, 1994, was intended to insure that she would be repaid from proceeds of the training center which she operated. The training center had a separate accounting system, which was in her control.

was not paid until the Spring of 1996. Again, particularly because the services rendered in connection with the contract followed the breakup, there is no basis to award either the corporation or the debtor any moneys in connection with the Camden County training contract.

■ The plaintiff is certainly correct that a cause of action may be sustained against officers, directors and/or shareholders where they breach their fiduciary duties to other shareholders by appropriating the business of the corporation to the detriment of minority stockholders. *See, e.g., Grato v. Grato,* 272 N.J.Super. 140, 153, 639 A.2d 390 (App.Div.), *certif. denied,* 138 N.J. 264, 649 A.2d 1285 (1994). In *Grato,* the majority shareholders of a closely-held family corporation dissolved the corporation and continued the business of the corporation under a different corporate name, clearly breaching their fiduciary duties to the minority shareholders.

A vastly different picture is presented here. Here, the plaintiff actually removed much of the business operations of Power LAN at the time of the breakup, including computers, a file server with critical corporate records, and several employees, and was able to establish a new business location almost instantaneously. In early September 1995, Brenda filed a complaint with the Superior Court of New Jersey seeking, among other things, a recognition by the court that she would have the opportunity to operate Power LAN without Brenda and Pauline. That recognition was not afforded to Brenda. Instead, in February 1996, the Superior Court issued an order restraining Brenda from interfering with the operations of Power LAN Industries, operated by Pauline and Bernard. In fact, the Superior Court order, dated February 16, 1996, orders the Camden County Family Development and Job Training Resource Center to disburse the moneys due to Power LAN to Power LAN, at Pauline's business address.

On this record, there is no support for the proposition that the defendants wrongfully misappropriated Power LAN's business, for which they must account to the plaintiff.

For the reasons expressed, debtor's quest to recover compensatory and punitive damages from Pauline and Bernard is denied with prejudice. The debtor's quest for a judgment against Power LAN for personal loans and deferred salary may be granted in the amount $90,000.00. Plaintiff's counsel shall submit an order in conformance herewith.